# In re ACUSHNET RIVER & NEW BEDFORD HARBOR: PROCEEDINGS RE ALLEGED PCB POLLUTION.

## Civ. A. No. 83–3882–Y.

United States District Court,
D. Massachusetts.

April 27, 1989.

---

Ellen M. Mahan, William D. Brighton, Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C., Martha Sosman, Chief, Civil Div., U.S. Attys.' Office, Boston, Mass., for U.S.

Lee Breckenridge, Chief, Nancy Preis, Asst. Attys. Gen., Environmental Protection Div., Dept. of Atty. Gen., Boston, Mass., for Com. of Mass.

Charles C. Bering, Office of Regional Counsel, U.S. EPA—Region I, Boston, Mass., Alice Crowe, OECM–Waste, LE 134S Washington, D.C., for U.S. E.P.A.

Hugh Schratwieser, Office of General Counsel, Washington, D.C., for Nat. Oceanic and Atmospheric Admin.

Daniel J. Gleason, Mary K. Ryan, Brian T. Kenner, Nutter, McClennan & Fish, Boston, Mass., for AVX Corp.

Paul B. Galvani, Roscoe Trimmier, Jr., Ropes & Gray, Boston, Mass., for Aerovox, Inc.

David A. McLaughlin, Michael J. McGlone, McLaughlin & Folan, New Bedford, Mass., for Belleville Industries, Inc.

Verne Vance, Jr., Richard W. Benka, Foley, Hoag & Eliot, Boston, Mass., for Cornell Dubilier Electronics Co., Inc.

John R. Quarles, Howard T. Weir, Morgan, Lewis & Bockius, Washington, D.C., for Federal Pacific Elec. Co.

Robert J. Muldoon, Jr., Daniel B. Winslow, Barbara O'Donnell, Sherin & Lodgen, Boston, Mass., for Aerovox, Inc. (Ins. Litigation).

William M. Savino, Gary D. Centola, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., Cynthia J. Cohen, Michael B. Bogdanow, Meehan, Boyle & Cohen, Boston, Mass., for Firemen's Fund Ins. Co.

James L. Ackerman, Day, Berry, Howard, Boston, Mass., Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., for Aetna Cas. and Sur. Co.

John P. Ryan, Sloan & Walsh, Boston, Mass., for Hartford Ins. Co.

Michael S. Greco, Lisa D. Campolo, Hill & Barlow, Boston, Mass., Timothy C. Russell, T. Andrew Culbert, Drinker, Biddle & Reath, Washington, D.C., for Lumbermen's Mut. Cas. Co. and American Motorists Ins.

Stephen J. Paris, Michael F. Aylward, Morrison, Mahoney & Miller, Boston, Mass., for CNA Ins. Co. and Reliance Ins. Co.

Roger E. Warin, Stephen A. Fennell, Anita G. Raby, Steptoe & Johnson, Washington, D.C., for Highlands Ins. Co.

Wm. Gerald McElroy, Jr., John T. Harding, Jr., Zelle & Larson, Waltham, Mass., for Employers Ins. of Wausau.

James P. Whitters, III, Gaston & Snow, Boston, Mass., for Liberty Mut. Ins. Co.

Bert J. Capone, Deborah S. Griffin, Peabody & Arnold, Boston, Mass., for Home Ins. Co. and Lexington Ins. Group.

Robert F. Corliss, Robert A. Romero, Jr., Corlis & Romero, Boston, Mass., Mary Ann D'Amato, Paul Moran, Mendes & Mount,

New York City, for Underwriters at Lloyd's.

Pamela C. Slater, Allan E. Taylor, Taylor, Anderson & Travers, Boston, Mass., for First State Ins. Co.

Timothy P. Wickstrom, Tashjian, Simsarian & Wickstrom, Worcester, Mass., for Mission Ins. Co.

Calum B. Anderson, Parker, Coulter, Daley & White, Boston, Mass., for Northbrook Excess & Surplus Ins. Co.

Carl K. King, Gayle M. Merling, Goldstein & Manello, Boston, Mass., for EPEC, Inc.

David P. Rosenblatt, Burns & Levinson, Boston, Mass., for Plating Technologies.

Erik D. Olson, Nat. Wildlife Federation, Washington, D.C., for Nat. Wildlife Federation.

### MEMORANDUM AND ORDER CONCERNING PARTIAL SETTLEMENT

YOUNG, District Judge.

These partially consolidated cases are presently before the Court for approval of a Partial Consent Decree (the "Proposed Decree") between the plaintiffs, the United States of America and the Commonwealth of Massachusetts (hereinafter, the "sovereigns"), and the defendant AVX Corporation ("AVX").[1] The Proposed Decree attempts to resolve the liability of AVX for injury to natural resources allegedly caused by the release of polychlorinated biphenyls ("PCBs") during its ownership

and operation of a capacitor manufacturing plant adjacent to New Bedford Harbor. The underlying action was brought, *inter alia,* under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. sec. 9607.[2] In addition, the Natural Wildlife Federation moved to intervene in the underlying action, in part to oppose the Proposed Decree.

### I. *The Motion of the National Wildlife Federation to Intervene*

A settlement agreement of two million dollars ($2,000,000) and a proposed judgment approving the settlement was filed with this Court on March 4, 1987. Notice of the proposed settlement was published in the Federal Register on March 12, 1987. 52 Fed.Reg. 7671 (March 12, 1987). On March 27, 1987, Aerovox Incorporated ("Aerovox") moved this Court to impose conditions on its approval of the Proposed Decree and to hold an evidentiary hearing.

As a preliminary matter, this Court must determine whether to permit the intervention of the National Wildlife Federation (the "Federation") which seeks, *inter alia,* to contest the Proposed Decree. The Federation seeks to represent the interests of its members who live in the New Bedford Harbor area. The Federation initially sought intervention as of right pursuant to Fed.R.Civ.P. 24(a) and the CERCLA intervention provision, 42 U.S.C. sec. 9613(i). The Federation, setting its sights somewhat lower at the hearing on intervention, now seeks permissive intervention subject

---

1. Taken together, these partially consolidated cases constitute quintessential complex litigation. As recognized by the American Law Institute Complex Litigation Project, "in massive environmental clean-up litigation what already is a highly complex basic dispute is compounded by the complexity of deciding the applicability of insurance coverage as well as assigning liability among multiple insurers." American Law Inst., Complex Litigation Project 17 (Tent. Draft No. 1, April 14, 1989).

This memorandum continues the discussion of the pre-trial issues raised in these partially consolidated cases. It is intended to be read with the Court's earlier decisions concerning jurisdiction and parties, *Acushnet River and New Bedford Harbor: Proceedings Re Alleged*

*PCB Pollution,* 675 F.Supp. 22 (D.Mass.1987) ("*Acushnet I*"), the right to jury trial, *Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 712 F.Supp. 994 (D.Mass. 1989) ("*Acushnet II*") and successor liability, *Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 712 F.Supp. 1010 (1989) ("*Acushnet III*").

2. The sovereigns filed amended complaints in early 1984 to include claims for recovery of governmental response costs incurred and to be incurred, for injunctive relief under CERCLA, and for claims under other federal and state environmental statutes and state common law.

to certain conditions pursuant to Fed.R. Civ.P. 24(b).[3] These conditions are as follows:

(1) The Federation may brief and argue the legal requirements applicable to any proposed consent decree lodged with this Court for consideration and approval.

(2) The Federation may brief and argue the appropriate measure of natural resource damages under CERCLA.

(3) The Federation may brief and argue the legal requirements for cleanup under CERCLA.

(4) The Federation may, with leave of the Court, brief and argue other legal issues in this case.

(5) The Federation may take an appeal from a judgment it views as adverse on issues (1) through (4) above.

(6) The Federation may not participate in discovery, the examination of witnesses, or the taking or contesting of evidence.

■ Whether to grant permissive intervention is a matter left largely to the discretion of the district court. *E.g., United States Postal System v. Brennan,* 579 F.2d 188, 191–92 (2d Cir.1978) (observing that "[p]ermissive intervention is wholly discretionary with the trial court" whose decision "may only be disturbed for clear abuse of discretion"); 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* sec. 1923 at 512–14 (2d ed. 1986). The rule requires that the application to intervene be timely.[4] In addition, several other factors are to be considered:

the nature and extent of the intervenor's interest, whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties, whether the applicant will benefit by the intervention, whether the intervenor's interests are adequately represented by the other parties, and whether the intervenors will significantly contribute to the full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented. *E.g., Brennan,* 579 F.2d at 191–92; *Spangler v. Pasadena City Bd. of Educ.,* 552 F.2d 1326, 1329 (9th Cir.1977); *see also New Orleans Public Service, Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 472 (5th Cir. 1984), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).

■ This Court holds that the application is timely. Although this suit had been filed approximately three and one-half years before the Federation sought to intervene, the Federation believed itself adequately represented by the sovereigns until the proposed settlement was announced. Without at all impugning the motives or conduct of the sovereigns, the Court notes that, upon review of that proposed settlement, the Federation apparently believed the settlement to be a betrayal.[5] It then moved promptly to intervene. On these facts, this Court refuses to hold the application untimely as matter of law. To do otherwise would promote a sort of prophylactic intervention whereby parties would be com-

---

**3.** Rule 24(b)(2) provides in pertinent part:

(b) **Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action:

.    .    .    .    .

(2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication or the rights of the original parties.

**4.** This Court observes that the timeliness inquiry considers four factors:

1) the length of time the applicants knew, or reasonably should have known, of their interest before they petitioned to intervene; 2) the

prejudice to existing parties due to the applicant['s] failure to petition for intervention promptly; 3) the prejudice that applicants would suffer if they were not allowed to intervene; and 4) unusual circumstances militating for or against intervention[.]
*Garrity v. Gallen,* 697 F.2d 452, 455 (1st Cir. 1983) (citations omitted); *see also Culbreath v. Dukakis,* 630 F.2d 15, 20–24 (1st Cir.1980). Obviously, there is some overlap between these factors and the factors generally listed below that are considered in granting or denying permissive intervention.

**5.** Under the *Garrity* analysis, *see supra* note 4, this Court holds that the sudden revelation of a divergence of interests between the sovereigns and the intervenor constitutes an unusual circumstance militating for intervention.

pelled to intervene in matters simply to protect their rights to participate in those matters downstream on the more or less remote chance that a party apparently protecting the intervenors' interests might someday betray them. Such a result would obviously be expensive and inefficient. Permitting parties like the Federation to intervene keeps the number of parties in a dispute at a minimum unless and until a real divergence of interests arises.[6]

This final point addresses another factor in the calculus: the adequacy of representation by another party. The Court holds that the sovereigns no longer adequately represent the Federation's interests in this matter. The sovereigns argue that their ultimate goal and that of the Federation are one and the same: "the restoration of the natural resources of New Bedford Harbor." Plaintiffs' Opposition to Motion of National Wildlife Federation to Intervene at 36 n. 23. Thus, they argue, the differences between themselves and the Federation concern means, not ends. *Id.*

However, such an analysis is a triumph of formalism over reality. The differences in the measure of damages sought by the sovereigns as opposed to the Federation are substantial. The sovereigns apparently believe that "the proper measure of [natural resource] damages is the *lesser* of the costs of restoring or replacing the injured resources and the resources' lost

use value." Plaintiffs' Reply to Brief of the National Wildlife Federation in Opposition to Proposed Partial Consent Decree at 21 (Docket # 1213) (emphasis in original). The Federation asserts that the correct measure is far more sweeping: the cost of restoration or replacement of the natural resources, or failing that, of the acquisition of equivalent resources, *plus* the lost use value. Reply Brief of the National Wildlife Federation to the Parties' Opposition to NWF's Motion for Permissive Intervention Subject to Certain Conditions at 3 n. 5 (Docket # 1244) (emphasis added). The exact amount of money damages that the sovereigns recover, one imagines, may well have a profound impact on the ultimate quality of the Harbor. Thus, the substantial divergence of views on the proper measure of damages between the sovereigns and the Federation necessarily renders the formers' representation of the latter inadequate.[7]

By permitting intervention in this matter, this Court assuredly will promote the just and equitable adjudication of the legal questions before it. Although the conditions the Federation voluntarily places on its intervention prevent it from contributing to the factual development of this case, its legal arguments will undoubtedly round out the considerations before this Court as the above discussion regarding the measure of damages makes clear.

---

6. The Court further notes that the putative intervenor will be prejudiced if intervention is denied to the extent that it will be unable to appeal the granting of summary judgment or the resolution of any of the legal issues on which it wishes to be heard. The prejudice to existing parties caused by intervention is addressed below.

7. Some of the defendants cite *Moosehead Sanitary District v. S.G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir.1979) which established that when a party and a potential intervenor have the same ultimate goal in a litigation, a presumption of adequate representation arises and argue that therefore the Federation's motion should be denied. Opposition of AVX Corporation, et al. to Motion of National Wildlife Federation to Intervene (Docket # 1216) at 15–16. There are two problems with this analysis. First, on its face *Moosehead* considered only intervention of right under Rule 24(a) and thus not the loosened standards of Rule 24(b). *Id.* at 52 n. 5. Second,

*Moosehead's* requirement of the same ultimate goal is rather manipulable. In the instant case, for example, one may characterize the goals of the Federation and the sovereigns as being one and the same—the remedying of the New Bedford Harbor's pollution—or as divergent—respectively, the restoration of the Harbor's natural resources along with payment for their lost use value versus the recovery of the lesser amount of the restoration of the resources or the lost use value. Given the realities of this litigation—specifically the substantial difference in possible recoveries under these two theories of damages—for the purposes of permissive intervention, this Court holds that there is significant adversity of interests between the sovereigns and the Federation. For the same reason, this Court holds that the Federation satisfies even the heightened showing required by *United Nuclear Corp. v. Cannon*, 696 F.2d 141, 144 (1st Cir.1982) to show inadequacy of the government's representation of the public interest.

Moreover, intervention will not cause undue prejudice or delay to the present parties. Analysis of this factor generally focuses on how the untimely entry of an intervenor into the fray may undo the work the parties have already done. With respect to future settlements or future consideration of the appropriate measure of natural resource damages or the legal requirements for cleanup under CERCLA, the Federation's participation in the process cannot undo any such work. No potential settlements are very far advanced as far as this Court knows. Further, the cleanup and natural resource damages issues remain unresolved and thus another view of the law will merely sharpen the debate, not reopen or delay matters. With respect to the Proposed Decree, as a practical matter the Court has already heard and read the Federation's argument. Thus, its input is already part of the calculus and any prejudice or delay from such arguments has already occurred.

True, the right to appeal that the Federation gains by intervention obviously increases the likelihood that any settlement approved by this Court will in fact be appealed. Several considerations, however, mitigate any ill effects of such a possibility. First, should the decree presently before the Court be approved, any appeal would appear to be interlocutory and thus must attend the end of AVX's participation in the case. The two million dollar settlement is to be paid to the sovereigns promptly after approval of the decree and thus the threat of an appeal by the Federation will not delay the money reaching the sovereigns' coffers. Even more significantly, no restoration or replacement of natural resources can begin until after the cleanup is finished. Far from having even begun yet, the cleanup awaits completion of studies by the sovereigns that will determine the most efficacious manner of proceeding. Thus, for aught this Court can see, none of the settlement money will be spent for years to come in any event.

Admittedly, should the Court of Appeals at some point vacate the instant settlement as improvidently approved, considerable time, effort, and money of the sovereigns and AVX will have been wasted. This Court, however, is still disposed to grant intervention. First, the Court observes with respect and diffidence that, given the broad discretion granted to trial courts to approve such settlements, the risk of reversal on this point seems acceptable in light of the benefits that settlement will confer on these parties. Second, this one settlement constitutes a relatively small part of this entire litigation and the nature of the intervention that the Federation seeks—the right to argue and to appeal with respect to settlements as well as the issues of cleanup and natural resource damages—is quite limited. Viewing the matter in the context of this entire massive litigation, the possible undue prejudice that may result to the existing parties discounted by the probability that such prejudice will ever occur is insufficient to offset the strong arguments for permitting intervention.

One further reason exists to allow intervention. Without intending any criticism of the sovereigns' advocacy, such intervention permits another voice and set of concerns to participate in the resolution of an extremely complex matter, both factually and legally—that necessarily is taking this Court and these parties into the heretofore largely uncharted waters of a relatively new statute. The further guidance of an additional entity, especially one with some expertise in the subject at hand, is therefore not lightly to be shunned. Indeed, as the balance of this opinion will reveal, the Federation's impact in shaping this litigation cannot be denied.

For these reasons, the Court GRANTS the Federation's motion to intervene permissively, subject to the conditions listed above.[8] One further restriction is imposed

---

**8.** The First Circuit's recent decision in *United States v. Metropolitan Dist. Comm'n*, 865 F.2d 2 (1989), cited by the sovereigns, does not require a different result. There, the court affirmed the district court's decision to deny intervention by a public interest group and several towns contiguous to Massachusetts Bay in a Federal Water Pollution Control Act case. The court specifically found that the trial judge did not abuse his broad discretion by denying intervention on the

which, the Court observes, is more a clarification in line with the Federation's intent than a substantive condition. The Federation may not argue to the jury the conclusions to be drawn from any evidence taken at trial or otherwise address any jury impaneled in this matter.

## II. *The Proposed Decree*

### A. The Non–Settlors' Motion.

█ In October, 1986, Congress passed the Superfund Amendments and Reauthorization Act of 1986, P.L. 99–499, sec. 101 *et seq.*, 100 Stat. 1613 (1986) ("SARA") amending CERCLA. Among the numerous changes it wrought in CERCLA, SARA added provisions covering settlements of CERCLA claims and, in particular, the question of contribution.[9] Included was a provision that, for the first time, granted settlors protection from contribution liability to non-settlors. The complete provision, 42 U.S.C. sec. 9613(f)(2), provides:

> **Settlement.**—A person who has resolved its liability to the United States or a State in an administrative or judicially

approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

Congress passed this provision to encourage settlement of CERCLA cases. Previously, settlors had no statutory assurance that any settlement that they reached with the EPA would end their liability in a case because non-settlors might later seek contribution from them. In an attempt to offset this disincentive to settle, the Environmental Protection Agency ("EPA") adopted a policy of reducing its judgment against non-settlors to the extent necessary to extinguish the settlor's liability to the non-settlors. *See* 50 Fed.Reg. 5034, 5039 (Feb. 5, 1985). SARA's contribution provision eliminates the need for such a policy where the settlement is "administrative or judicially approved." [10]

---

liability issue. The trial court denied intervention because, *inter alia,* such intervention was untimely. The district court noted that the putative intervenors' interest in the litigation was apparent arguably as far back as June, 1985, *United States v. Metropolitan Dist. Comm'n,* 679 F.Supp. 1154, 1161 (D.Mass.1988), yet they did not seek intervention until October, 1987, more than two years later. (The Federation represents, and no party disputes, that, although the district court opinion in *Metropolitan Dist. Comm'n* is silent on the matter, the trial court docket reveals intervention was not sought until October, 1987.) Unlike the instant case, those intervenors' motions clearly were untimely.

9. The doctrine of contribution allows a settlor who has paid all or a portion of a judgment to seek contribution from other jointly and severally liable parties. At common law, a settlement by the plaintiff with one or more joint tortfeasors does not release the settling defendants from contribution. The common law rule discourages the settlement of cases because the defendant settlor remains potentially liable for contribution. The Uniform Contribution Among Joint Tortfeasors Act, sec. 4, 12 U.L.A. 63 (1975), and most state statutes, including that of Massachusetts, release the settlor from liability for contribution. *See, e.g.,* Mass.Gen.Laws ch. 231B, sec. 4.

10. Aerovox asserts that SARA's addition of subsection 113(f)(2) to CERCLA was not intended

to change the EPA's settlement policy, but is simply another protection mechanism for achieving the fair and reasonable apportionment of damages among joint tortfeasors. This Court disagrees. The EPA's policy is best understood as a proper attempt by an agency to fill in the interstices of an incomplete statutory framework that was supplanted by a later clear directive from Congress. That clear directive necessarily trumps the old EPA policy.

Admittedly, the few decided cases do not clearly point this way. The court in *City of New York v. Exxon Corp.,* 697 F.Supp. 677 (S.D.N.Y. 1988) seems to have discussed but not to have decided the significance of subsection 113(f)(2). The court noted that "section 113(f)(2) apparently compels the non-settlers to absorb the shortfall" between the settlement and the settlor's proportional share. 697 F.Supp. at 681 n. 5. Elsewhere, the court acknowledged that some other courts have applied the Uniform Comparative Fault Act (essentially the EPA's pre-SARA policy) to post-SARA settlements. 697 F.Supp. at 683 n. 9. These latter cases are indeed puzzling to this Court in that they fail even to discuss the language of subsection 113(f)(2). *Lyncott Corp. v. Chem. Waste Management, Inc.,* 690 F.Supp. 1409, 1418 (E.D.Pa.1988) (adopting the Uniform Comparative Fault Act approach in a cleanup settlement); *Edward Hines Lumber Co. v. Vulcan Materials Co.,* No. 85 C 1142, 1987 WL 27368 (N.D.Ill.1987) (adopting a similar rule in a cleanup settlement).

The result is a powerful tool—actually a carrot and a stick—placed in the hands of the EPA to obtain settlements. The carrot the EPA can offer potential settlors is that they need no longer fear that a later contribution action by a non-settlor will compel them to pay still more money to extinguish their liability. In addition to this protection, settlors themselves are enabled to seek contribution against non-settlors. 42 U.S.C. sec. 9613(f)(3)(B). As for the stick, if the settlor pays less than its proportionate share of liability, the non-settlors, being jointly and severally liable,[11] must make good the difference. In this respect, the words of the statute are clear: the potential liability of the others is reduced "by the amount of settlement," not by the settlor's proportionate share of any damages ultimately determined to have been caused.[12]

This result is in keeping with Congress' intent to encourage CERCLA settlements and reduce the time and expense of enforcement litigation that necessarily diverts money from cleanup and restoration.[13] Were the law otherwise, the responsibility of a settlor for damages would need to be fully litigated by the sovereigns and the non-settlors to determine the settlor's proportional share, thus largely duplicating the aspects—and expense—of the litigation the settlement was designed to avoid.[14]

The two non-settlors opposing the Proposed Decree—Aerovox and Belleville Industries, Inc. ("Belleville")—argue correctly that, for AVX to gain contribution protection, this Court must approve the settlement pursuant to 42 U.S.C. sec. 9613(f)(2). Before approving such a settlement, this Court must ascertain "that it is fair, adequate, and reasonable, and consistent with the Constitution and the mandate of Congress." *City of New York*, 697 F.Supp. at 692 (citation omitted); *see also United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1337 (S.D.Ind.1982) (pre-SARA CERCLA case).

A multiplicity of factors are considered in evaluating whether the Proposed Decree before this Court is fair and reasonable. The protection of the public interest is paramount. *Seymour Recycling Corp.*, 554

Finding these cases unpersuasive, this Court chooses to follow the plain language of the statute and holds that subsection 113(f)(2) of SARA has supplanted the EPA's prior policy.

**11.** The parties do not dispute, and it is generally the case, that CERCLA defendants are jointly and severally liable. Indeed, the concept of contribution only makes sense in a context of joint and several liability. *See, e.g., United States v. Chem–Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983); Garber, *Federal Common Law of Contribution Under the 1986 CERCLA Amendments*, 14 Ecology L.Q. 365, 368–69 (1987) (gathering cases). Exceptions to this rule have been made where a violator's actions have had a *de minimis* effect and where apportionment is readily accomplished, for example where the harms caused are distinct or are otherwise capable of a reasonable and rational division. *See* Garber, *supra*, at 368–69 & n. 32.

**12.** Massachusetts law yields the same result. *See* Mass.Gen.Laws ch. 231B, sec. 4.

**13.** *See City of New York*, 697 F.Supp. at 693 (noting that the SARA amendments were intended to " 'expedite effective remedial actions and minimize litigation' ") (quoting 42 U.S.C. sec. 9622[a] ); 132 Cong.Rec. H9564 (daily ed. Oct. 8, 1986) (statement of Rep. Lent) ("I am pleased to report that the idea of encouraging settlements is no longer considered ground breaking but now is a simple and obvious matter of good policy. Costly protracted litigation threatens the effectiveness of the Superfund Program and consumes resources better spent on cleanup."); Garber, 14 Ecology L.Q. at 373–74; Note, *Superfund Settlements: The Failed Promise of the 1986 Amendments*, 74 Va.L.Rev. 123, 124–26, 135 (1988).

**14.** Were the law otherwise, the sovereigns would be involved in litigating the exact share of each of the settlors for the overall liability in order to determine the remaining amount to be recovered from the non-settlors, surely a dauntingly difficult, expensive and time-consuming task. It thus might cost the sovereigns more to settle with one party than not to settle since, if the sovereigns do not settle, they can merely prove that all five defendants here polluted and seek recovery from all or any one of them in any proportion the sovereigns choose because the defendants in such a case are generally jointly and severally liable. Admittedly, the non-settlors may bring contribution actions against each other no matter how this provision is interpreted. But the sovereigns need not be party to such litigation under this Court's interpretation of the statute, thus fulfilling Congress' intention to encourage settlement, to save the sovereigns' litigation expenses, and to keep the cost of pollution on the potentially responsible parties.

F.Supp. at 1337. Among the other factors a district court should consider in measuring the fairness and reasonableness of a settlement are:

a comparison of the strengths of plaintiffs' case versus the amount of the settlement offer; the likely complexity, length, and expense of the litigation; the amount of opposition to the settlement among affected parties; the opinion of competent counsel; and, the stage of the proceedings and the amount of discovery already undertaken at the time of the settlement.

*E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir.1985) (citations omitted), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986); *see also City of New York,* 697 F.Supp. at 692 (employing a similar list of factors).

The district court's opinion in *City of New York* provides additional helpful guidance:

In assessing [the above factors], however, the Court's role is not unlimited. Settlements are to be encouraged and the court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." [*City of Detroit v.*] *Grinnell* [*Corp.,*], 495 F.2d [448] at 456. [2nd Cir.1974] And "where there has been arms length bargaining among the parties (and) sufficient discovery has taken place to enable ... counsel to evaluate accurately the strengths and weaknesses of the plaintiff's case ... there is a presumption in favor of the settlement," *Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y.1980), *aff'd,* 647 F.2d 163 (2d Cir.1981), particularly where "a government agency committed to the protection of the public interest" has participated in and endorsed the agreement. *Id.*[;] [*cf. Federal Trade Comm'n v. Standard Financial Mgt. Corp.,* 830 F.2d 404, 408 (1st Cir.1987) (holding that the trial court "should accord some substantial deference to [an] agency's determination that [a] settlement is appropriate" in a deceptive trade practices case) (citation omitted).] Finally, in addition to the general

federal policy favoring settlements, *see Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960), the reviewing court must be mindful that Congress, in enacting the 1986 amendments to CERCLA sought to "expedite effective remedial actions and minimize litigation." Section 122(a).

The balance to be struck between the policies favoring settlements and the need to safeguard the public interest in cases of this type was best summarized in *United States v. Carrols Development Corp.,* 454 F.Supp. 1215 (N.D.N.Y. 1978):

It is not the Court's function to determine whether this is the best possible settlement that could have been obtained but rather the Court's duty is to determine "whether the settlement is within the reaches of the public interest." *Id.* at 1222 (quoting *United States v. Gillette Company,* 406 F.Supp. 713, 716 [D.Mass.1975]).

697 F.Supp. at 692–93.

An analysis of all the above factors reveals that Aerovox and Belleville have failed to overcome the material in the record that favors approving this settlement. With respect to the mandate of Congress, the various discernable intentions of Congress can be gleaned from the cases, statutory language, and legislative history. First, that body adopted CERCLA to provide the government with the authority and mechanisms to combat hazardous substance spills, leaks, and other releases. Hazardous waste disposal poses a serious and increasing threat to the environment. Congress realized that it was imperative "that the Federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal." *Dedham Water Co. v. Cumberland Farms Dairy Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986) (citing *United States v. Reilly Tar & Chem. Corp.,* 546 F.Supp. 1100, 1112 [D.Minn. 1982]).

CERCLA was designed "to protect and preserve public health and the environ-

ment." *Dedham Water*, 805 F.2d at 1081. That Congressional purpose is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation. Without question, Congress passed the SARA amendments to encourage settlements for this very reason.[15] Indeed, subsection 113(f), as well as section 122, both added to CERCLA by the SARA amendments, are devoted to facilitating just such arrangements.

■ Second, as noted above, the contribution protection provision in CERCLA subsection 113(f)(2) encourages settlement by preventing non-settlors from seeking contribution from settlors. This Court is obligated to interpret the contribution provisions of CERCLA to avoid frustration of the Act's remedial purpose. *United States v. Mottolo*, 605 F.Supp. 898, 902 (D.N.H. 1985). An evaluation of the Proposed Decree which overemphasizes the importance of its potential effect on the non-settlors, which Aerovox and Belleville appear to advocate, would frustrate the statute's goal of promoting expeditious resolution of harmful environmental conditions. This Court, therefore, holds that in measuring whether the Proposed Decree is fair, reasonable, and protective of the public interest the effect on the non-settlors is not determinative, but is merely one factor in the calculus. Such an interpretation of subsection 113(f)(2) promotes the intent of Congress by giving the federal government a powerful tool necessary for a prompt and effective response to problems of national magnitude resulting from hazardous waste disposal.

Third, the Proposed Decree between the sovereigns and AVX is consistent with the mandate of Congress. The Court's review of the record assures it that the terms of the Proposed Decree are fair and adequate, that the settlement is reasonable under the facts, and that, with but two exceptions,[16] it protects the public interest. *See Culbreath v. Dukakis*, 630 F.2d 15, 23 (1st Cir.1980); *Seymour Recycling Corp.*, 554 F.Supp. at 1337; *United States v. Hooker Chem. & Plastics Corp.*, 540 F.Supp. 1067, 1072 (W.D.N.Y.1982).

Court approval of the Proposed Decree between the sovereigns and AVX is in the public interest. The voluntary settlement of litigation is high in judicial favor both generally, *see, e.g., Citizens For a Better Environment v. Gorsuch*, 718 F.2d 1117, 1126 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984), and in CERCLA actions in particular.[17]

The settlement of the natural resource damages action between the sovereigns and AVX will save the sovereigns, and subsequently the public, considerable time and money that would otherwise be expended at trial. Settlement provides substantial funds for the rehabilitation of New Bedford Harbor without the risks and costs of lengthy litigation.

The immediate transfer of funds is a significant factor because it gives the sovereigns control over and the interest derived from a substantial amount of money. The start of any trial in the instant matter, already long delayed by a protracted criminal case the Court is trying in Springfield, Massachusetts,[18] remains uncertain. The

---

**15.** *See supra* note 13.

**16.** *See infra* at 1036–38.

**17.** *See supra* at 1026–27.

**18.** This case is *United States v. Levasseur et al.*, No. 86–180–Y. Of it, this Court has written: The ambitious indictment sought to be tried here is a prime example of the sweeping powers Congress has conferred upon the executive branch [through passage of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. sec. 1962]. This indictment lists well over twenty predicate acts and involves the

presentation of evidence concerning conduct in various locations in Connecticut, Maine, Massachusetts, New York, New Jersey, Ohio, and Pennsylvania. The government's witness list includes 325 names. Thousands of documents and items of tangible evidence are expected to be introduced. The trial itself is estimated to last from six to twelve months. *United States v. Levasseur*, No. 86–180–Y, slip op. at 36 (D.Mass. May 4, 1988). "The aggregate reimbursement of counsel appointed under the Criminal Justice Act, 18 U.S.C. sec. 3006A, to represent these indigent defendants has exceeded $800,000 in the pre-trial jury selection phase

first two of several related trials in the instant case, running concurrently, are expected to last three to four months and the substantial expense of such a trial will accord with its length.[19]

Moreover, a trial of this claim would be complex, lengthy, expensive and uncertain as an examination of five aspects of this litigation will demonstrate. First, the scope of provable natural resource damages in this matter is hotly disputed by the parties whose divergent approaches would result in widely varying recoveries should any liability be found. Second, it may be difficult to link the harm caused by any PCB release from the AVX facility to the PCB's found elsewhere in the Harbor. AVX began operating its New Bedford Harbor plant in 1938. Years may have passed between the time of the releases and any quantifiable impact upon the Harbor; years more may have passed before any such impact was first discovered. Moreover, at least two types of hazardous PCB waste were allegedly released into the Harbor by the operators of the two different New Bedford plants. Those two plants have been under the management and control of five different corporate owners. Damage caused by the behavior of AVX may be difficult to measure and distinguish from damage caused by other plant operators. Third, and relatedly, the responsibility for the condition of New Bedford Harbor is diffuse in another respect. The sovereigns here seek to recover only for that injury to natural resources caused by PCB contamination, yet the Harbor appears rife with a variety of contaminants. It may prove difficult to distinguish whether some injury is caused by PCB's or by other pollutants. While problems of divisibility of the injury and damages due to PCB contamination may be less a concern to the sovereigns because they may well be able to hold the defendants jointly and severally liable, protracted contribution litigation among any non-settlors may be necessary. Fourth, the unsettled nature of CERCLA law, which the myriad pretrial motions in this matter reflect, argues in favor of this settlement. The inherent uncertainty in such a state of affairs makes settlement desirable for the parties and satisfies the public interest by securing a substantial recovery in the face of unknown and perhaps unknowable odds. Fifth, AVX sold its interest in the plant in 1973, seven years before the passage of CERCLA, and pre-enactment damages to natural resources stemming from pre-enactment releases are not compensable under CERCLA. 42 U.S. C. sec. 9607(f)(1). Thus, whether, and to what extent, the sovereigns will be able to recover for natural resource damages from AVX remains in doubt. In light of these factors and the novelty of this action, this Court rules that the settlement of the natural resource damages claim under section 107 of CERCLA between the sovereigns

of these proceedings." *United States v. Levasseur,* 704 F.Supp. 1158, 1165 n. 12 (D.Mass.1989). Trial commenced in this case on January 9, 1989. The aggregate cost of the representation of these indigent defendants stood at $1,088,932 after three months of trial.

**19.** This Court, in an earlier pre-trial order, required the sovereigns to proceed separately against each of the alleged polluters in trying their claims for injury to natural resources (though it later consolidated the trials against Belleville and Aerovox). Due to the exhaustive —and exhausting—pre-trial orders entered herein, the parties have been required to request the admission of each and every fact they seek to establish. With the universe of facts thus established, the individual trials have been limited to four months apiece. The jury proceedings are scheduled to run from 9 a.m. to 1 p.m. on each trial day and the related jury-waived trials involving insurance coverage for each of the alleged polluters will run concurrently from 2–5 p.m. on the same trial days. The cost to the public of devoting such extensive judicial resources to these cases is not insignificant. In 1987, exclusive of any of the parties' legal costs, it was estimated that one day of trial in a United States District Court costs the public $10,000–$15,000. *See Chappee v. Commonwealth of Massachusetts,* 659 F.Supp. 1220, 1226 n. 9 (D.Mass.1987), *reversed on other grounds sub nom., Chappee v. Vose,* 843 F.2d 25 (1st Cir. 1988). Inflation no doubt has rendered this figure conservative. Moreover, the enormous burden of trying cases such as *United States v. Levasseur, see supra* note 18, and these cases, virtually back-to-back, necessarily means that scarce judicial resources will be unavailable for other litigants, equally deserving, who have waited just as long for justice. These facts highlight the institutional benefits to be gained from prompt, just settlements.

and AVX is fair, reasonable, and in the public interest.

Turning to the other factors in the matrix, the Court notes that only two of the four non-settlors oppose the settlement. In addition, none of the non-settlors disputes that this settlement was arrived at by competent counsel after protracted arms-length negotiations. Without question, that settlement is based on the extensive discovery that has already occurred in this case.[20] That discovery renders unnecessary the evidentiary hearing Aerovox has requested.[21]

Moreover, the explanation for the amount of the settlement is reasonable. Aerovox contends that on its face settlement is unreasonable where the sovereigns are seeking 50 to 70 million dollars in natural resource damages and are offering to

extinguish the liability of one of the five jointly and severally liable defendants for a mere two million dollars. However, despite what the sovereigns are seeking now in damages, their unchallenged assertion is that, at the time this settlement was negotiated, they had estimated the damages to be 34 million dollars. Discounting that sum in light of the complexity of the case, the novelty of the law and the problems of proof, the sovereigns determined that twelve million dollars would be a satisfactory overall settlement of this aspect of the case at that time. Dividing that figure in half between the two allegedly polluting plants involved left six million dollars to be collected from AVX, Aerovox and Belleville.[22] The sovereigns sought 2.3 million dollars from each of the first two, and 1.4

20. "Creative lawyers ... have shown that both justice and efficiency can be achieved by those willing to stretch the bounds of the existing procedural scheme." American Law Inst., Complex Litigation Project 11 (Tent. Draft No. 1, April 14, 1989). As mentioned above, *see supra* note 19, one of this Court's pre-trial orders requires that each litigant request the admission, pursuant to Fed.R.Civ.P. 16 and 36, of every fact which it intends affirmatively to prove at trial. The order bars the litigants from offering affirmative evidence on any point as to which no request has been filed and requires that each request be detailed "to the level of specificity of a patent claim." In this fashion the Court sought to establish the entire universe of facts with which it and the jury must wrestle in this complex litigation. As a result, the sovereigns have filed tens of thousands of requests for admission, the great bulk of which are supported by detailed data gleaned from exhaustive discovery and trial preparation materials. The notebooks in which the requests are cataloged fill four full bookcases.

21. Of course, there are other reasons not to hold an evidentiary hearing. First, such a hearing would amount to a trial on the merits in terms of the time and expense involved. Such a hearing is impractical given the facts in dispute and is not required by precedent or policy. *See City of New York*, 697 F.Supp. at 689–92 (denying a hearing regarding a CERCLA settlement). In *United States v. Ketchikan Pulp Co.*, 430 F.Supp. 83 (D.Alaska 1977), the parties disagreed as to the scope of an approval hearing for a consent decree in an action brought under the Federal Water Pollution Control Act, 33 U.S.C. sec. 1311 *et seq.* The *Ketchikan* court ruled that "[a]lthough the court is obligated to protect the public interest it is not necessary to hear all the evidence to perform that function." *Id.* at 86.

Moreover, to grant inevitably lengthy hearings in cases such as this would either frustrate the express intent of Congress to encourage settlement or negate the benefits of any settlement that resulted. *See supra* note 13. This Court does not require a factual presentation to support every settlement reached by a government agency. "Unless a consent decree is unfair, inadequate or unreasonable, it ought to be approved.... [T]he courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment." *Securities and Exchange Commission v. Randolph*, 736 F.2d 525, 529 (9th Cir.1984); *accord United States v. Jackson*, 519 F.2d 1147, 1151 (5th Cir.1975).

The objecting non-settlors generally assert that the record before the Court is insufficient. Without more concrete objections to the settlement—other than the amount versus the damages sought, an argument disposed of elsewhere —a full-blown evidentiary hearing which would amount to a fishing expedition is neither necessary nor prudent. *See City of New York*, 697 F.Supp. at 692 (holding that generalized assertions that the record before the court is insufficient are not enough to require a hearing). The Court also notes that courts largely have followed the cleanup versus monetary settlement distinction in determining whether to hold hearings. *See id.* at 689–91 (discussing the cases and declining to give a hearing regarding a monetary settlement).

22. The other allegedly polluting plant was owned, at all material times, first by the defendant Cornell–Dubilier Electronics, Inc., and then by the defendant Federal Pacific Electric Company. Apparently, the sovereigns demanded the remaining six million dollars from these two defendants.

million dollars from Belleville.[23] Hard negotiation, one imagines, resulted in the final figure of two million dollars. *Cf. City of New York,* 697 F.Supp. at 693 (accepting a settlement that required seven of fifteen main defendants to settle their liability for approximately fourteen million dollars where the estimated remediation cost was 400 million dollars).

As noted above, this Court is not required to ensure that the sovereigns have struck the best deal possible. Nor must this Court ensure that the settlement is perfectly calibrated in terms of shares of liability so long as it is generally fair and reasonable. Thus, the Court is not disturbed that AVX may have owned the polluting plant the longest and thus, if all other factors are ignored, may be assumed to have caused the most pollution. On the other hand, AVX may well deserve a premium, at least in the view of the sovereigns, for being the first defendant to settle, and for doing so well in advance of the trial of its portion of the case. Fairness does not require, when later discovery and developments in the law convince the sovereigns that the damages are greater and their case stronger than they first appeared, that AVX should be required to pay more. Quite the contrary—AVX deserves, and the sovereigns apparently have seen fit to award, a lower settlement amount for its having negotiated in good faith early on. If this price is no longer available to the other defendants, they have only themselves to blame; and if the SARA amendments, with respect to contribution, leave the remaining defendants on the natural resource damages issue facing greater liability than their pro rata share, "their dispute is with Congress." *City of New York,* 697 F.Supp. at 694.

Finally, this Court is unpersuaded by Aerovox's argument that, if the sovereigns chose to settle AVX's portion of the case for two million dollars, the sovereigns should bear the loss for any shortfall caused by the discounted settlement. That is, the non-settlors should not be required to make up the difference for the sovereigns' mistaken settlement strategy by paying the remainder of the settlor's share as well as their own.

The problem with this approach is that it would effectively read out of subsection 113(f)(2) the last phrase: "[the settlor's settlement] reduces the potential liability of the others by the amount of the settlement." 42 U.S.C. sec. 9613(f)(2). A court should not construe a statute so as to render any of it a nullity, *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985), but Aerovox's argument would do just that. It is self-evident that generally defendants do not settle litigation for the full value of the asserted damages. Faced with a demand for full damages, a defendant might just as well go to trial, save for the litigation costs and possible interest on a resulting judgment. Thus, in the general run of CERCLA cases, this Court imagines that defendants will generally settle for substantially less—indeed, often for far less given the inherent problems of proof in these cases—than the asserted damages. The Court further imagines that in all of these cases the non-settlors will be able to muster the very argument raised here: fairness requires a proportionate reduction. And so the last phrase of the statute, squarely placing the balance of the settled share on the non-settlors, disappears. This Court will not so frustrate Congress' will.

B. The National Wildlife Federation's Contention that the Proposed Decree is Not in Compliance with Section 122 of CERCLA.

The National Wildlife Federation moves that this Court reject the Proposed Decree because it does not comply with the intent

---

**23.** Belleville is no longer actively engaged in business and has transferred all its assets to Aerovox. *Acushnet I,* 675 F.Supp. at 38. As a practical matter, therefore, the discount offered Belleville appears to reflect the additional difficulty of obtaining indemnity from its insurer since that party, Lumbermens Mutual Casualty Co., like the insurers of all the defendants, is defending under a reservation of right and is vigorously pursuing a pre-trial declaration that it has no coverage obligations to Belleville.

or provisions of CERCLA, is not fair, adequate and reasonable, and is not in the public interest. More specifically, the Federation contends that the Proposed Decree does not provide for full restoration and replacement of the injured natural resources and that it waives claims for future damages in contravention of CERCLA's intent and in violation of two provisions of section 122 of CERCLA, 42 U.S.C. sec. 9622.

The first provision in question, subsection 122(j)(2), the natural resource damages settlement provision of CERCLA, provides:

An agreement under this section may contain a covenant not to sue under section 9607(a)(4)(C) of this title for damages to natural resources under the trusteeship of the United States resulting from the release or threatened release of hazardous substances that is the subject of the agreement, but only if the Federal natural resource trustee has agreed in writing to such covenant. The Federal natural resource trustee may agree to such covenant if the potentially responsible party agrees to undertake appropriate actions necessary to protect and restore the natural resources damaged by such release or threatened release of hazardous substances.

42 U.S.C. sec. 9622(j)(2).

The Federation interprets subsection 122(j)(2) to require that any consent decree entered into under the CERCLA settlement provision that includes a covenant not to sue for natural resource damages under subsection 107(a)(4)(C) must also provide for full restoration and replacement of the injured natural resources (or acquisition of equivalent resources) as required by the language of, and policies underlying, CERCLA. The Proposed Decree between the sovereigns and AVX includes a covenant not to sue AVX for natural resource damages. The Federation argues that the Proposed Decree should not be approved because the sovereigns' settlement for substantially less than the full natural resource damages asserted means that the Proposed Decree necessarily fails to pro-

vide for the "actions necessary to protect and restore" New Bedford Harbor under the mandate of section 122.

The second provision in question, subsection 122(f)(6)(A), states:

(6) Additional condition for future liability

(A) Except for the portion of the remedial action which is subject to a covenant not to sue under paragraph (2) or under subsection (g) of this section (relating to de minimis settlements), a covenant not to sue a person concerning future liability to the United States shall include an exception to the covenant that allows the President to sue such person concerning future liability resulting from the release or threatened release that is the subject of the covenant where such liability arises out of conditions which are unknown at the time the President certifies under paragraph (3) that remedial action has been completed at the facility concerned.

42 U.S.C. sec. 9622(f)(6)(A).[24]

The Federation interprets this subsection to mean that CERCLA settlements including a covenant not to sue must contain a "reopener" clause that permits future litigation between the United States and the settlors concerning further damage due to presently unknown conditions. Because the Proposed Decree contains no such clause—indeed, the sovereigns, in the Proposed Decree, explicitly promise not to sue AVX for damages presently unknown caused by the release of PCB's, Proposed Decree at para. VII—the Federation argues it should not be approved.

The Federation's argument, at first glance, appears to fail primarily because the requirements of section 122 apply only to a natural resource damages settlement that is part of the settlement of a larger cleanup. Indeed, both the language of the statute and the legislative history lend significant support to this view.

Admittedly, section 122 is not a model of clarity. The thrust of its provisions, however, suggest that it is intended to reach

---

**24.** 42 U.S.C. sec. 9622(f)(6)(B) provides an exception to this provision not relevant here.

cleanup settlements. Its opening provision, subsection 122(a), which is best understood as an introduction of sorts, grants the President authority to enter into agreements "to perform any *response actions*.... Whenever practicable and in the public interest, ... the President shall act to facilitate agreements *under this section* ... in order to expedite effective *remedial actions* and minimize litigation." 42 U.S.C. sec. 9622(a) (emphasis added). The subsections of section 122 that follow provide the President with a variety of procedures through which to achieve and structure such cleanup settlements. Those sections, as one would expect, largely focus on the cleanup aspects of such a settlement.[25]

The legislative history, from beginning to end, further emphasizes the concern of Section 122 with cleanup settlements. As the 1985 House Judiciary Committee Report stated, "This new section sets forth a series of provisions designed to encourage and facilitate negotiated private party *cleanups* of hazardous substances in those situations where negotiations have a realistic chance of success." H.R.Rep. No. 253, 99th Cong., 1st Sess., pt. 3, at 29 (1985) (emphasis added). *Accord* H.R.Rep. No. 253, 99th Cong., 1st Sess., pt. 5, at 58 (1985) ("This new section 122 is intended to encourage and establish procedures and protections *pertaining to negotiated private party cleanup* of hazardous substances where such cleanup is in the public interest") (emphasis added). Congress was concerned with and condemned past "sweetheart deals that EPA negotiated with [potentially responsible parties] several years ago that led to the resignation of Rita Lavelle and Anne Burford," and passed section 122 to ensure that the "EPA can

negotiate tough settlements with [potentially responsible parties] in the interest of cleaning up a site more quickly.... Settlement should only occur if the President is satisfied that the site will be cleaned up more quickly and at least as completely as it would be if the fund were to perform the cleanup. Without doubt, settlement of cases is not an opportunity to avoid any of the cleanup requirements or procedures of the act." 132 Cong.Rec. S14,918 (daily ed. Oct. 3, 1986) (statement of Sen. Mitchell). The Joint Explanatory Statement of the Committee of Conference was no less clear with respect to the cleanup orientation of section 122 in describing the initial versions as passed by the Senate and the House:

> The Senate amendment authorizes the President to enter into settlement agreements with potentially responsible parties for the payment or conduct of *remedial* action.
>
> \*   \*   \*   \*   \*   \*
>
> The House amendment confirms the authority of the ... EPA to enter into settlement agreements with responsible parties regarding the *clean-up* of sites where hazardous substances have been or are threatened to be released.

H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 251 (1986) (SARA Conf.Rep.) (emphasis added). The Conference substitute provision similarly emphasized cleanup settlements:

> The purposes of the settlement procedures set forth in section 122 are to expedite settlements and to assure the effective *clean-up* of Superfund sites.

*Id.* at 252 (emphasis added).[26]

Viewed in this context, neither subsection 122(j) (covenant not to sue) nor subsection 122(f)(6)(A) (reopener clause), strictly

---

25. For example, subsection 122(c)(1) ties the scope of a covenant not to sue to the permanency of the remedy (i.e., cleanup) undertaken by the settlors. Subsection 122(d)(1) explicitly discusses "agreement[s] ... with respect to *remedial action*...." (Emphasis added.) Subsection 122(e)(1) provides for special notice and moratorium procedures for use when "a period of negotiations ... would facilitate an agreement with potentially responsible parties for taking *response action* ... and would expedite *remedial action.*" (Emphasis added.)

26. *See also* 132 Cong.Rec. H9563 (daily ed. Oct. 8, 1986) (Statement of Conf. Comm. Chair. Rep. Dingell) (Section 122 was "designed to facilitate settlement negotiations to expedite effective *site cleanup* by private parties....") (emphasis added); 132 Cong.Rec. S14,903 (daily ed. Oct. 3, 1986) (Statement of Sen. Stafford, Senate floor manager for SARA) (Section 122's purpose is to encourage government agencies "to increase their efforts to impose the burden and costs of *cleanups* on responsible parties through the use of settlement agreements") (emphasis added).

speaking, seems applicable to this settlement. Subsection 122(j) on its face pertains to "agreement[s] under this section." 42 U.S.C. 9622(j)(2). Because section 122 covers cleanup settlements, subsection 122(j) therefore would not seem to apply to settlements limited to natural resource damages.[27] This result is not necessarily illogical, as the Federation asserts. Congress, for example, may have been concerned that natural resource damages claims otherwise would be lost in the rush to secure a cleanup settlement and thus moved to strengthen substantially the hand of the federal natural resource trustee. Such a concern is at least muted where the natural resource damages claim is settled separately.[28]

With respect to subsection 122(f)(6)(A), it similarly does not appear to apply to this non-cleanup settlement, as the Federation essentially admits. *See* Reply of the Natural Wildlife Federation to Plaintiffs' Response to NWF's Opposition to Proposed Partial Consent Decree (Docket #1235) at 5. Indeed, it does not seem to apply by its own terms, nor in the context of section 122 as a whole. Subsection 122(f)(6)(A) states, "Except for the portion of the *remedial action* [subject to covenants not to sue under other section 122 provisions,] a covenant not to sue a person concerning future liability to the United States shall include an exception to the covenant [making the person liable for future releases arising from conditions unknown] at the time the President certifies ... that *remedial* action has been completed at the facility concerned." (Emphasis added.) Such language strongly suggests that the subsec-

tion is concerned with cleanup settlements. The legislative history, to the extent it addresses this aspect of subsection 122(f), confirms this interpretation. Senator Stafford, for example, stated that "the bill reaffirms the President's authority to preserve the ability to take enforcement actions ... if any future problems develop at a site *cleaned up under a consent decree.*" 32 Cong.Rec. S14,904 (daily ed. Oct. 3, 1986) (emphasis added); *see also* 32 Cong.Rec. S14,919 (daily ed. Oct. 3, 1986) (Statement of Sen. Mitchell on subsection 122[f]).

■ Despite the apparent thrust of the language and the legislative history of section 122 in general and the two specific provisions in particular, this Court remains troubled by a holding that the two provisions do not apply to this settlement. Admittedly section 122 in general and the two provisions in particular appear to apply only in the context of a cleanup settlement. Yet no separate corresponding provision addresses the requirements of a natural resource settlement preceding a cleanup settlement. The lack of such a provision is fully explained by the fact that, customarily, natural resource damages settlements follow or are contemporaneous with cleanup settlements. This is so because, customarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup, together with the lost use value and the costs of assessment. As a residue of the cleanup action, in effect, they are thus not generally settled prior to a cleanup settlement. For the reasons set forth in *Acushnet II*,

---

**27.** Indeed, Rep. Jones, apparently referring to subsection 122(j), noted in his remarks to the House that "the conference report requires EPA to notify all Federal trustees of any effort to negotiate cleanup agreements with responsible parties where there may be damages for natural resources." 132 Cong.Rec. H9612 (daily ed. Oct. 8, 1986). Clearly then, the natural resource damages settlement provision of subsection 122(j) appears to be intended by Congress to apply in the cleanup settlement context.

**28.** A ruling that subsection 122(j) does not apply would appropriately prompt some concern. Such an interpretation of section 122 permits it to be easily side-stepped by parties clever

enough to bifurcate the settlement into two agreements—one for the cleanup and one for the natural resource damages. Indeed, courts would need to beware of such potential, collusive results and be prepared to thwart them by refusal to sanction such settlements that seek to evade by artful drafting the clear intent of Congress. In any event, such concerns are not present in this case. The procedural posture of this litigation—specifically, the fact that the natural resource damages claims will be tried before the cleanup claims—fully explains why this natural resource damages settlement precedes and is separate from any cleanup settlement.

*see id.* at 996–97, in the instant matter, the sovereigns' natural resource damages claim will be tried before the response costs claim.[29] Thus, this case presently stands in a procedural posture that Congress, in all likelihood, did not foresee. Even though Congress, never anticipating the circumstances of the instant matter, had no intent one way or the other whether the two provisions in question should apply to the Proposed Decree, this Court holds that they do apply in order to fulfill the more general intent of Congress with respect to the proper manner of settling CERCLA actions.

Moreover, had this Court held that these provisions do not apply, the general intent of Congress with respect to settlements still could not be ignored. As noted above, one of the factors that a court must consider in evaluating a consent decree is its consistency "with ... the mandate of Congress." *City of New York*, 697 F.Supp. at 692; *see also United States v. Seymour Recycling Corp.*, 554 F.Supp. at 1337 (pre-SARA CERCLA case). Thus, regardless whether the provisions of section 122 apply to settlements limited to natural resource damages claims, the statute without question represents Congress' clearest statement on CERCLA settlements in general and natural resource damages settlements in particular.

With respect to subsection 122(j)(2), Congress' concerns expressed therein—that "the potentially responsible party agree[ ] to undertake appropriate actions necessary to protect and restore the natural resources damaged ..."—apply equally to the instant Proposed Decree. Thus, on this alternative ground, the Court must examine the settlement to ensure that the Congressional mandate has been satisfied.

The Court holds that it has. The Federation argues that subsection 122(j)(2) means that a settlement is only possible where the potentially responsible party agrees to fully restore the damaged natural resources. The only support for this position is a snippet of legislative history.[30] Such an interpretation seems neither requisite nor wise. Quite clearly, few settlements would ever be possible where the United States' bottom line is 100% of asserted damages. Nearly all defendants would prefer to go to trial thereby thwarting the clear intent of Congress, discussed above, to promote CERCLA settlements.

An interpretation of the statute more in keeping with the intent of, as well as the language employed by, Congress is one that requires the United States to assess the strengths and weaknesses of its case and drive the hardest bargain it can. As fully outlined above, this Court is satisfied the United States [31] has done just that with respect to this aspect of the case and therefore holds that the settlement satisfies the Congressional intent that AVX, through the payment of two million dollars, "undertake appropriate actions necessary to protect and restore the natural resources damaged" in New Bedford Harbor. 42 U.S.C. sec. 122(j)(2). However, the Court is unaware of any indication in the record be-

---

**29.** Due to the Court's inability to commence the trial of this action as soon as it might wish, *see supra* at 1029 & n. 18, it may yet be that the administrative predicate for trial of the response costs claim will be laid before the first segment of the trial of the natural resource damages claims gets underway. Should that be the situation, the Court will consider whether it is in the interest of justice to frame jury questions as to the response costs claim and try that claim to the same jury that considers the claim for natural resource damages.

**30.** The remarks of Representative Jones, Chairman of the Merchant Marine Committee, one of the committees reporting SARA to the full House, constitute the history in question: "[A] covenant not to sue may be agreed to by a

Federal trustee only if the responsible party agrees to restore, rehabilitate or acquire the equivalent of damaged natural resources." 132 Cong.Rec. H9612 (daily ed. Oct. 8, 1986). The Court finds this statement unpersuasive because Representative Jones made it in the course of sketching the broadest outlines of the bill, rather than in an analysis of what particular language in that bill meant. Thus, the words are more a shorthand description than an interpretation of subsection 122(j)(2).

**31.** Subsection 122(j)(2) names "the Federal natural resource trustee [as the one who] may agree to such covenant [not to sue as is contained in the Proposed Decree]." 42 U.S.C. sec. 122(j)(2).

fore it that the Federal natural resource trustee (the "trustee") has agreed to the covenant not to sue. Until such time as the Court is made aware that the trustee does so agree, the Court may not and will not approve the Proposed Decree.

▆ Just as with subsection 122(j)(2), even had this Court held that subsection 122(f)(6)(A) did not apply to the Proposed Decree, the underlying policy expressed therein by Congress informs this Court's evaluation of the Proposed Decree. The thrust of this subsection is to ensure that the federal government, and thus ultimately the taxpayer, does not bear the costs of future unknown damages. Rather, such costs appropriately should be borne instead by those responsible for the pollution. This is in keeping with Congress' intent to make responsible parties pay for the problems caused by their own pollution. *E.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir. 1986). Indeed, the legislative history leaves no doubt that preventing potentially responsible parties from escaping future liability was a primary concern of Congress. As Senator Stafford stated,

> [C]ovenants not to sue for undetected contamination at a site [pursuant to subsection 122(f)(6)(B) ] are included in consent decrees under extremely rare circumstances. In over 200 cases settled under the Superfund Program, the Government has included such covenants in only two or three cases. *The provision anticipates no increase in or expansion of this policy or its rate of application.*

132 Cong.Rec. S14,904 (daily ed. Oct. 3, 1986) (emphasis added).

Across the aisle, Senator Mitchell was equally emphatic about the dangers of releasing potentially responsible parties from future liability:

> In addition, it is important for the President [when considering whether to include a covenant not to sue] to ask a basic question: Who will pay if there is a problem in the future? So little is known about much of the contamination at Superfund sites, that it is difficult to be sure that no future liability will occur.... [F]uture enforcement action should be an option under the covenants to assure that the public health is protected. From the perspective of the public, if the President does not use every option at the President's disposal to protect the public health, then the public is placed at a severe disadvantage.

132 Cong.Rec. S14,919 (daily ed. Oct. 3, 1986). *See also* 52 Fed.Reg. 28,038, 28,-040–41 (July 27, 1987) (stressing the Congressional concern that potentially responsible parties should remain liable if an agreed upon settlement proves inadequate to protect the environment and the public health).

Congress' response to these concerns was to require reopener provisions except in those rare cases where "extraordinary circumstances" were present. 42 U.S.C. sec. 9622(f)(6)(B). Indeed, the House Conference Report reveals that a provision more hospitable to reopeners was replaced by a tougher measure in the Conference:

> The conference substitute deletes the House provision regarding a potentially responsible party's ability to obtain a covenant not to sue without a "reopener" for unknown conditions if that responsible party contributes to a "Groundwater and Surface Water Protection Fund" for any future problems at the facility. Instead, new section 122(f)(6)(B) is added to require, *except in extraordinary circumstances,* reopeners for unknown conditions. The provision now states that settlements shall not be granted without reopeners for unknown conditions, except in extraordinary circumstances where all other terms and conditions of the settlement agreement are sufficient to protect health and the environment from any future releases at or from the facility. This provision should be implemented in a manner consistent with the current application of the Administration settlement policy as to unknown conditions.

H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 255 (1986) (emphasis added).

This Congressional concern is as applicable to a natural resource damages settlement as it is to a cleanup settlement. In both cases, unknown conditions can lead to further releases causing further damages. Admittedly, requiring such a provision will make settlements somewhat more difficult to achieve. Beyond peradventure, however, Congress is willing to accept such a trade-off in return for greater security that the settlement will adequately resolve a pollution problem in the cleanup context and no reason is evident why that intent should not apply to the natural resource damages context.

As noted, the present Proposed Decree contains no such reopener clause. Indeed, some of the language in it appears expressly to guarantee AVX that the sovereigns will not sue AVX for unknown damages in the future caused by the release of PCBs. Proposed Decree at para. VII. On the record before the Court, no "extraordinary circumstances," as the term is used in subsection 122(f)(6)(B), appear present that would place this case in that rare one percent of cases identified by Senator Stafford that warrant the absence of such a clause. The Court thus rules that the lack of a reopener clause is a violation of subsection 122(f)(6)(A) as well as against the intent of Congress and not in the public interest.

For the reasons stated above, the Proposed Decree is approved in all respects and every particular save two: 1) it is not clear to the Court on this record that the trustee has agreed to the covenant not to sue, 42 U.S.C. sec. 122(j)(2), and 2) the Proposed Decree fails to include a "reopener" provision as "an exception to the covenant [not to sue] that allows the President to sue [AVX] concerning future liability resulting from the release or threatened release that is the subject of the covenant where such liability arises out of conditions that are unknown at the time [of the entry of the Proposed Decree]." *See* 42 U.S.C. 9622(f)(6)(A). Should the trustee agree to the covenant and the parties negotiate such a reopener provision and resubmit the Pro-

posed Decree as thus amended, the Court will act thereon promptly.