The STATE OF UTAH, By and Through the UTAH STATE DEPARTMENT OF HEALTH, Plaintiff,

v.

KENNECOTT CORPORATION, Defendant,

Salt Lake County Water Conservancy District, Intervenor.

Civ. No. 86–C–0902G.

United States District Court, D. Utah, C.D.

Sept. 3, 1992.

---

Joseph E. Tesch and Fred G. Nelson, Salt Lake City, Utah, for plaintiff.

James B. Lee and Daniel M. Allred, Salt Lake City, Utah, for defendant.

Douglas J. Parry and Dale F. Gardiner, Salt Lake City, Utah, for intervenor.

## MEMORANDUM AND ORDER

J. THOMAS GREENE, District Judge.

This matter is before the court on the joint motion of plaintiff, the State of Utah, and defendant, Kennecott Corporation, for approval of a proposed Consent Decree relating to a negotiated monetary settlement for damages to the State's interest in ground waters in an area within Salt Lake County, Utah. The proposed Consent Decree would settle the State's claim for natural resources damage under Section 107 of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, et seq.[1]

## I. BACKGROUND FACTS

### A. *Kennecott's Five-year Hydrogeologic Study*

In 1983, Kennecott undertook a five-year hydrogeologic study to assess surface and ground water conditions in a 216 square mile area affected by mining and milling operations in the Bingham Mining District. Officials of the State of Utah and Salt Lake County were consulted and informally participated in the study through advisory groups. On October 4, 1983, Kennecott submitted ground water monitoring data to the State which indicated significant ground water contamination from the Kennecott operations. In December 1983, the State requested additional information and investigation, and continued to monitor the study. After Phases I and II of the five-year study had been completed in 1985, Kennecott, the State of Utah and Salt Lake

---

**1.** References hereafter are to the Transcript and exhibits introduced at hearings before the court   March 23–30 and May 14, 1992.

County entered into a Memorandum of Agreement dated June 3, 1985, to formalize participation of the environmental health departments of the concerned State and local governments. (Exh. P–10.) Among other things, the agreement called for completion of the five year study with annual reports and development of a final Environmental Impact Assessment (EIA). On March 15, 1990, a draft of an EIA was submitted by Kennecott (Exh. P–28), but a final EIA as required by the June 3, 1985 Memorandum of Agreement has never been completed.

### B. State Claim and Lawsuit for Natural Resources Damage

On July 31, 1986, the State filed a Notice of Claim for Natural Resource Damages under section 107 of CERCLA in the amount of $129 million dollars. The damage figure was based upon present and anticipated injury to 59,406—109,215 acre feet of ground water in the affected area over a ten to twenty year period. In a transmittal letter to Kennecott, Kenneth L. Alkema, Director of the State Division of Environmental Health, took the position that Kennecott should be given the opportunity to complete its ongoing hydrogeologic study and "to conduct a comprehensive resource damage assessment," but that in order to preserve its rights under CERCLA, and to prevent expiration of the statute of limitations, the claim was being filed by the State and would be followed up with a lawsuit. (Exh. P–41.) On October 3, 1986, the State filed the pending lawsuit against Kennecott seeking, among other things, recovery pursuant to Section 107(a)(4)(C) of CERCLA for alleged damage to State ground water natural resources.

Immediately after the lawsuit was filed, this court granted a motion to stay all proceedings so that the parties could pursue and complete the five year study, and later continued the stay pending settlement negotiations.

### C. Kennecott's Experts

In 1987 Kennecott contracted with Dames & Moore, an environmental consult-ing firm in Denver, Colorado, to prepare a computer-generated ground water model to simulate past, present and future conditions of the affected ground water in order to project future movement of the contaminated plumes which had been identified. After the five year study was completed, Kennecott retained an expert hydrologist, Adrian Brown, of Adrian Brown Consultants (ABC) Denver, Colorado, to provide additional data. ABC drilled nine new wells for purposes of analysis, and reevaluated the five year study data.

### D. Kennecott Offer of Settlement

In August 1990, Kennecott presented an offer of settlement to the State which envisioned exchange of water rights valued at about $2 million dollars for the natural resource damage, plus providing about $100 million worth of remediation work. The Kennecott proposal involved:

- Kennecott undertaking remedial actions aimed at curtailing potential sources of groundwater pollution;
- Kennecott undertaking actions to remediate the heavy metals plume;
- Kennecott assigning water rights to the State as replacement for ground water containing elevated levels of sulfates and heavy metals;
- The State dismissing the lawsuit with prejudice. (Exh. P–44 at 2–4.)

The remedial action proposed by Kennecott involved drilling very deep wells below the low pH or heavy metals plume (area of contamination characterized by low pH materials or heavy metals) and pumping the contaminated water down through the uncontaminated soil, attenuating the metals and raising the pH. (Trans. Vol. I Pt. 2 at 179.)

### E. State's Evaluation of the Kennecott Offer

The State looked to its own staff at the Utah Department of Environmental Health, environmental health personnel at Salt Lake City—County, and experts it hired to evaluate the Kennecott offer. The principal expert concerning natural re-

sources damages was RCG/Hagler, Bailly, Inc. of Boulder, Colorado, which organization supplied a substantial "Preliminary Assessment of Natural Resource Damages Associated with Kennecott Mining Operations in the Great Salt Lake Valley" dated December 20, 1990. ("Hagler report") (Exh. P–44.) Dr. Douglas James at the Utah State University was hired to evaluate the Hagler report, and Dr. Upmanu Lall, an Associate Professor at Utah State University, was hired to review the Kennecott proposal and to estimate the "safe annual yield" of the underground waters in the affected area. Dr. Hong of the University of Utah also was hired to evaluate Kennecott's settlement offer.

The Hagler report was never finalized, but it set forth much information and a

2. The Hagler report set forth the following pertinent to damages determination:

[T]here are several factors to indicate that the damage estimates might be underestimated. First, we *have not incorporated past damages,* to the extent that contamination has already affected welfare in the valley (net of Kennecott's past efforts to provide deeper wells to impacted users, etc.). These losses accrued to households who had their well supplies tainted, and may also include foregone increases in property values due to potential inhibitions on increased residential development in that part of the valley. Second, the *water resource values* are based on transactions that are unlikely to have fully taken into account the recent recognition of *water scarcity in the valley.* Third, the estimated groundwater damages only pertain to the contaminated waters, and do not include damages that are likely to arise due to institutional efforts to manage the *plume's future growth and movement* through reducing allowable pumping rates at permitted wells along and beyond the edges of the plume. Finally, the damage estimates do not include values for *injuries other than groundwater contamination.*

\*   \*   \*   \*   \*   \*

[T]he value of these damages depends on the quantity of water impacted, and the value of the damages appears to range between *$283 to $1429 for each acre foot of safe annual yield* impacted (and may be as high as *$2162 per acre foot* if one considers outright replacement). (emphasis added.)

3. The Hagler report called the following to the attention of the State:

It must be recalled that the contaminant plume acts in a dynamic rather than a static manner. This dynamic behavior has two important ramifications. First, *future advection*

proposed course of action which would have identified more fully damages suffered and to be suffered by the State as a result of the contamination, as well as alternatives for remediation.[2] The report stressed that the heavy metals plume where there is much contamination presents a dynamic and spreading problem rather than a static situation.[3] As to the potential quantity of ground water which may be regarded as damaged, the report states:

To estimate total groundwater damages, the above range of values ($283/AF to $1429/AF) was multiplied by the annual yield represented by the plume. Kennecott's estimate of 8,000 AF as a safe annual yield relies on an overly limited

*and dispersion of the plume would involve increasing the volume of groundwater affected* (and, thus, proximate damages). Theoretically, one could calculate the maximum possible extent of damages (in the future) by estimating the total mass of contaminant present in the aquifer, and dividing it by the volume of water needed to dilute that mass to the desired threshold concentration (e.g., 500 mg/1 for sulfates).

A secondary consideration associated with a dynamic plume involves the *institutional, management, and energy costs required to minimize future expansion of the plume.* Historically, the main influence on the contaminant plume appears to have been hydrogeologic. The leading edge of the contaminated water has moved down-gradient towards the Jordan River.... Assuming other factors remain constant, it appears that the plume will eventually flow, as a result of the hydraulic gradient, up through the confining layer into the Jordan River....

The main institutional element associated with the plume is the *administration of well pumping* from the principal aquifer throughout the Salt Lake Valley. Based on the number of perfected and approved well permits for the principal aquifer, *it appears that the aquifer is over-appropriated.* Pumping associated with a certain number of all of these well permits may change the direction and steepness of the hydraulic gradient, thereby allowing *the plume to spread in different directions and at different rates than at present....*

It appears that when considering the dynamics of the plume, there is a significant hidden administrative cost over and above any natural resource cost being pondered. Thus, *if administrative steps are needed to contain the plume, this cost should be considered as part of any damage claim.* (emphasis added.)

interpretation of the plume (delineating the plume at 1000 mg/1 of sulfates, rather than the 400 to 500 mg/1 range that the U.S. EPA has stated it intends to propose for health-based drinking water standards). With a larger plume so defined, and with more appropriate interpretations of the concept of safe annual yield, *the impacted yield may be as high as 100,000 AF/year.* (emphasis added.)

Estimated damages to the State were set forth in the Hagler report using three approaches—restoration, replacement and loss of value. Estimated damages values based on these methods alone, apart from other damage considerations noted in the report, ranged from $2.3 million to $216 million, depending upon the quantity of ground water contamination and the method of valuation. It was also noted in the Hagler report that one "appreciable negative attribute" of the proposed settlement was that it "use[d] dismissal with prejudice to preclude future claims for natural resource damages other than those associated with groundwater plume remediation," and that it did not cover other damages, including "potential losses of intrinsic values." (Exh. P–44 at pp. 2–5.)

A "Preliminary Assessment Plan" envisioned in the Hagler report apparently was never ordered by the State. It was also pointed out in the Hagler report that "more refined estimates of natural resources damage would require *substantial additional information,*" particularly as to alternative estimates of plume size. (Exh. P–44 at p. 6–2) (emphasis added.) Hagler has not been authorized by the State to provide such additional information.

Dr. Lall, the State's expert ground water hydrologist at Utah State University, considered two areas for safe annual yield analysis, which areas had been identified by Dames & Moore. The first was an area of 216 square miles, 15.75 miles in the east-west direction and 13.75 miles in the north-south direction, which covered contamination from the Kennecott site within " 'the entire area of known and potential contaminant effects related to the mining and leaching activities,' and relevant boundary

fluxes." (Exh. P–47—Attachment 1, p. 2.) The other area identified was 77.5 square miles, "a smaller area that bounds the area with wells that had one or more drinking water standard violations." (*Id.*) In this smaller area Dr. Lall estimated the safe annual yield to be 25,000 to 40,000 acre feet. In a letter to the State dated February 6, 1991, Dr. Lall pointed out that the *"safe yield issue is incontrovertibly tied to the remediation issue"* and said that *"the appropriate area to consider for yield analysis depends on the outcome of the remediation process."* (Exh. P–47) (emphasis added.) On the assumption that the likelihood of success of the proposed remediation is low, Dr. Lall opined that "the area to be considered for safe yield impact should reflect the present and *potential* extent of contamination." (Exh. P–47—Attachment 1, p. 1.)

Dr. Douglas James of Utah State University, an expert engaged by the State to evaluate the Hagler report, submitted a preliminary review on January 15, 1991. (Exh. P–45.) He noted that RCG/Hagler Bailly, Inc. had discussed "environmental and social impacts ... from the depletion of a groundwater resource" and damages to the State apart from loss of the "safe annual yield" value. (*Id.*) Dr. James also stressed that *loss of the underground aquifer* for "subsurface storage as a reserve during drought or after a climate change" was a major element of damage. (*Id.*)

In March 1991, Terry D. Sadler, the Director of Environmental Health for Salt Lake City–County, in a letter to Mr. Alkema, expressed grave concerns as to the Kennecott settlement proposal and called for completion of the final Environmental Impact Assessment required by the terms of the Memorandum of Agreement entered into by the State, Salt Lake County and Kennecott in 1985. (Exh. I–34.) Mr. Sadler evaluated the Kennecott offer thusly:

> Removing just the metals from the contaminated plume while leaving the water unusable to Salt Lake County residents is unacceptable. Additional consideration must be given to the sulphate

plume where treatment is logical in relation to public health and should be part of remediation.

\* \* \* \* \* \*

As we emphasized earlier, it is inappropriate and contrary to good public health practices to limit cleanup levels to only CERCLA parameters. The aquifer east of the evaporation ponds has been contaminated, private wells have been rendered useless, the plume outline has not been defined, plume migration has not been evaluated, and the public has been put at risk because some private well users are drinking water containing metals and other contaminates in amounts that exceed the drinking water standards. Again, in no case should the decision be no further action. (Exh. I–34 at 3.)

After due consideration and review from September 1990 to March 1991, the State rejected the Kennecott settlement proposal.

F. *Negotiations and Agreement for Separate Settlement of Natural Resources Damage Claim*

In rejecting the Kennecott proposal, the State determined that remedial action issues should be analyzed in greater detail and pursued with the approval and cooperation of the Environmental Protection Agency (EPA). Mr. Alkema testified at the hearing that ultimate remediation "probably would and will cost in excess of several hundred million dollars." (Trans. Vol. I Pt. 2 at 185.) Negotiations involving EPA, the Utah Department of Environmental Quality [DEQ] and Kennecott began in February 1991 to establish a "framework for the parties to negotiate a legally enforceable consent decree." This resulted in an Agreement in Principle which was executed on about April 1, 1992. (Attached to State of Utah's Posthearing Brief, Exh. A.) The agreement covers all Kennecott property located in and around the Oquirrh mountains, excluding active mining operations in Barneys Canyon, and calls for Kennecott to pay response costs which will be incurred by EPA and DEQ in cleaning up the contamination at or from Kennecott's property. *The natural resource damage claim in the case at bar will not be affected by the future clean up consent decree.* However, the Agreement in Principle does specify that entry of the proposed Consent Decree in the case now before this court

in no way affects or prejudices the United States' ability to require Kennecott to perform response actions under CERCLA (or recover costs for response actions implemented by the EPA), including but not limited to those for ground water, and that such settlement will not impair whatever rights, if any, federal trustees may have to bring a claim for resources within their trusteeship. (*Id.* at 4.)

During the period March to July 1991 the State and Kennecott negotiated settlement of the State's natural resource damage claim apart from remediation. Coincidentally during this same time frame, on April 5, 1991, the Utah State Engineer released the "Salt Lake Valley Interim Ground–Water Management Plan" (Interim Plan) which identified nine water quality zones in the Salt Lake Valley, and set out the maximum annual withdrawals from each zone. (Exh. P–1.) The water quality zones set forth in the Interim Plan were based upon data and maps developed by the USGS. (Trans. Vol. I Pt. 2 at 53–64.) The Interim Plan identified area eight as having a maximum withdrawal rate of 13,000 acre feet per year. Thereafter, the State and Kennecott determined that area eight of the Interim Plan embraced the apparent area in which Kennecott's operations have caused underground water contamination. Accordingly, this area was adopted as the appropriate area within which damages should be calculated, and was designated as the "Mining Impact Area" (MIA). In this regard, the State and Kennecott also reached agreement that the "safe annual yield" of the aquifer within the MIA essentially was the same as the maximum withdrawal rate for area eight as identified in the Interim Plan, 13,000 acre feet per year. Accordingly, the $11.7 million dollar settlement figure which was arrived at primarily was based upon an estimate of the market value of water rights per acre foot within

the MIA multiplied by the 13,000 acre feet per year "safe annual yield" estimate. Litigation costs, legal uncertainties such as causation, as well as present availability and use of the settlement money were factors also taken into account.

The State's decision to settle was based upon its determination that the contaminated ground water within the MIA cannot feasibly be remediated. Mr. Alkema did not insist that Kennecott should finalize the Environmental Impact Statement with a full discussion of alternatives because he had determined that only natural remediation would be feasible. He so testified at the hearing:

> [I]t was my conclusion that practically the only thing that will work and is feasible is to allow the aquifer to self-attenuate, to let it essentially be cleaned up by the soil as the contaminated water moves through it.

(Trans. Vol. II Pt. 1 at 5–6.) This process of natural remediation will take hundreds of years to eliminate the acid plume and approximately a thousand years to remove the sulfate plume.[4]

### G. *Proposed Consent Decree*

On or about July 31, 1991 a proposed Consent Decree was tendered to the court which envisioned settlement of the State's natural resource damage claim for $11.7 million. Kennecott and the State assume in the Consent Decree that the safe annual yield of underground waters within the entire MIA has been permanently lost because of contamination and that the estimated 13,000 acre feet safe annual yield must be permanently replaced.[5] Another assumption is that the sulfate plume and the heavy metals or low pH plume will continue to be confined within the MIA. For purposes of settlement, it was also agreed that the waters lost should be valued at the same market value as waters of drinking water quality. In exchange for

$11.7 million, the proposed Consent Decree provides that the State releases and covenants not to sue Kennecott as follows:

> 1) regarding *damages for injury to, destruction of, or loss of surface water or groundwater* in the Mining Impact Area under federal law, State law, or common law including the cost of assessing such injury, destruction or loss; and 2) for administrative or injunctive relief or *response costs in connection with any groundwater plume remediation* (as that term is commonly understood, not as defined by statute or regulation) in the Mining Impact Area under CERCLA, the State Hazardous Substances Mitigation Act (Utah Code Ann. Section 19–6–301 *et seq.*), or under common law. The term "groundwater remediation" does not include remediation or control of sources that have contributed, or may contribute, to contamination of surface or groundwater. (emphasis added.)

The Consent Decree also contains a reopener provision in the form of a reservation of the State's right to institute proceedings against Kennecott for damages "that are of a type that was unknown, or of an order of magnitude greater than was known to the State at the date of entry of this Decree...." as well as the right to seek ground water plume remediation based on conditions "that are of a type unknown, or of an order of magnitude greater than was known to the State at the date of entry of this Decree...." Finally, the Consent Decree preserves potential claims by third parties, and excludes whatever claims third parties might have:

> The Decree does not bind third parties who are not parties to this Decree, and the Decree does not resolve or bar claims, if any, of third parties, including, but not limited to, claims by political subdivisions of the State for interference with the quantity or quality of their water rights; provided, however, that noth-

---

**4.** Trans. Vol. III Pt. 2 at 59–61.

**5.** Kennecott asserts that some water in the area is being used for "irrigation and other purposes" and that "the contaminated plume has had little impact on use of the ground water within the

Mining Impact Area. Kennecott owns most of the rights to the ground water within the Mining Impact Area and continues to pump water from the aquifer for industrial and other purposes." (Kennecott's Prehearing Brief, at 14.)

ing in the Decree affects Kennecott's rights or defenses against third parties with respect to such claims.

Following a public comment period relative to the proposed Consent Decree, on October 25, 1991 the court heard extensive argument. by counsel for the State and Kennecott in which both parties urged court approval of the proposed settlement and opposed intervention by the Salt Lake City Water Conservancy District (SLCWCD). The court also heard argument by SLCWCD in favor of intervention. The court declined approval of the settlement and proposed Consent Decree at that time and ordered an evidentiary hearing on the following issues in order to determine the merits of the settlement:

1) The nature and extent of natural resource damage which has been caused by Kennecott;

2) Whether it is feasible to restore or remediate the contamination caused by Kennecott within the identified area;

3) How the damages which have occurred to the natural resources may be measured, whether on the basis of restoration, replacement, market value or otherwise;

4) The nature and extent of SLCWCD's interest in underground waters which may be impaired by reason of implementation of the Proposed Consent Decree Order dated November 18, 1992.

SLCWCD was granted permissive intervention to participate in discovery and to present evidence at the hearing.

### H. *Evidentiary Hearing*

A week-long evidentiary hearing was held from March 23, 1992 to March 30, 1992, and on May 15, 1992, at which various exhibits and extensive testimony were presented to the court by the State, Kennecott and the SLCWCD. The evidence as related to the issues identified by the court and other issues regarded by the court of particular import included the following:

### 1. Nature and Extent of Natural Resource Damage Caused by Kennecott

Mr. Alkema testified on behalf of the State that the contamination formed two plumes, a low pH or heavy metals plume "approximately 4 square miles in surface area," and a sulphate plume "approximately 17 square miles in area." (Trans. Vol. I Pt. 2 at 142.) At the present time the contaminated plumes are contained within the 40 square mile area identified at the hearing as the "Mining Impact Area" (MIA). The MIA happens to be almost identical in size with water area eight which was identified by the State Engineer in the Salt Lake Valley Interim Ground-Water Management Plan, released in April 1991 (Exh. P–1.)

Mr. Adrian Brown of Adrian Brown Consultants testified on behalf of Kennecott that assuming source controls are implemented he did not "believe it [the low pH plume] will ever leave the Mining Impact Area." (Trans. Vol. III Pt. 2 at 40.) According to Mr. Brown, the MIA has "a very great amount of neutralizing material" such that "the acid will be destroyed" by natural materials. (*Id.*) Mr. Brown testified that given the approximately "billion tons" of neutralizing calcium carbonate in the MIA which acts to neutralize the low pH, there are enough neutralizing agents to "take care of the plume in perpetuity," "providing there is some level of source control." (*Id.*) However, Mr. Brown also testified that natural attenuation and remediation will take hundreds of years of movement through soils. In this regard, Mr. Brown testified that natural remediation of the sulfate plume would take "in the order of a thousand years" (Trans. Vol. III Pt. 2 at 61) provided there is "source control from Kennecott's mining operations." (*Id.* at 60.) With regard to the acid plume, he estimated that if Kennecott implements various source controls it will take approximately 512 years for the low pH plume to naturally remediate. (*Id.* at 59–60.)

SLCWCD presented evidence that the area of damage even now extends well

beyond the MIA based upon ground water well readings which indicate contamination of various kinds beyond "background" levels. (Trans. Vol. I Pt. 2 at 20; Trans. Vol. V Pt. 1 at 14, 15; Trans. Vol. IV Pt. 2 at 95–97; Trans. Vol. IV Pt. 2 at 104–05.) In this regard, Mr. Kaliser, of Bruce N. Kaliser & Associates, a consulting practitioner in engineering geology and ground water hydrogeology, testified that the area of contamination was larger than the 40 square miles identified as the MIA, and said that the area of contamination is more accurately described as an area with a wide transitional zone rather than distinguished by a single bright line. (Trans. Vol. IV Pt. 2 at 102.) According to Mr. Kaliser the area which has been impacted by Kennecott's mining operation is "54–½ square miles for the interior limit of the transition zone. For the exterior or outside limit it's 70 square miles," with a volume of acre feet affected by Kennecott's mining operations, of 2,398,000 acre-feet for the interior limit and 3,024,000 acre-feet for the exterior limit of the transition zone. (*Id.* at 110.) Mr. Kaliser presented evidence of contamination outside the MIA based on drinking water standards.[6] He also presented data relative to the erratic and complex geologic formations in the area and probable extent of the plumes.[7]

Evidence was presented to the effect that not all of the waters within the MIA are contaminated,[8] and that Kennecott cannot necessarily be identified as having caused all of the contamination.[9] However, it was acknowledged that contaminated substances attributable to Kennecott oper-

**6.** Mr. Kaliser identified data which indicated concentrations exceeding drinking water standards, and testified:

> For that five-year period, ... this volume contains the actual figures, the values of the constituents that exceed—those values that exceed drinking water standards for each one of the following constituents: chlorides, total dissolved solids, sulfates, aluminum, manganese, iron, lead, selenium, copper, silver, cadmium, zinc.... Here I've indicated in a synopsis of the extent to which these substances have been found in excess of the drinking water standards. For example, total dissolved solids exceeded the standards in 179 wells, and they exceeded them up to 6,330 percent of the standard. I have provided that information for each one of the constituents. (Trans. Vol. IV Pt. 2 at 64.)

These conclusions were challenged by Kennecott as misleading and based upon insufficient data.

**7.** *Mr. Kaliser testified that there were additional* geologic features, not considered by Kennecott, that "contributed to the extent of the plume" such as "the presence of sinkholes" and "faults in the valley fill or the alluvium." (Trans. Vol. IV Pt. 2 at 52.) "Faults in the valley fill could modify the flow of groundwater and redirect or channel it." (*Id.*) "Sinkholes are open voids of vertical extent indicating open channels flow and become most significant." (*Id.*) Mr. Kaliser also noted the existence of "volcanic rock" in the area and that its porous nature "permits the passage of groundwater through it more readily than either the bedrock under it or the alluvium over it in many cases. So that's a potential pathway [to the aquifer.]" (*Id.* at 61.)

**8.** Mr. Alkema testified that "[t]here are areas within the ... mining impact area which are not yet contaminated by the plume that Kenne-

cott has created.... So there are areas that could be used within the plume and in fact are being used within the plume at the present time." (Trans. Vol. II Pt. 1 at 27.)

**9.** *Evidence was presented that mining compa-*nies other than Kennecott could have contributed to part of the damage, and that contamination from natural processes not directly related to mining activities could have caused some of the damage. (Trans. Vol. I Pt. 1 at 5–9; Trans. Vol. I Pt. 2 at 9; Exh. P–28 at 5–9.) Mr. Fred Nelson, counsel for the State, represented that "the history of the mining operations in this area, the story would go back a [sic] 150 years." (Trans. Vol. 1 Pt. 1 at 6.) In this regard, Mr. Alkema testified:

> There have been ... significant mining activities historically here since 1860. And there are along Bingham Creek ... mine tailings that are all along here. There are the Anaconda tailings that are on this side of the creek that were deposited shortly after the turn of the century. As mining proceeded and they developed newer techniques or better techniques for protecting the environment as well as for operations, instead of just dumping the tailings down the creek they began building tailings ponds.... Also another section of tailings are the Lark tailings, again were deposited after the turn of the century, they were reworked a little bit later in the '60s and '70s, ... You can also see along here various tunnels that were used to mine the ore body in the past, the Bingham Tunnel, the Mascotte Tunnel, and the Butterfield Tunnel. Those were used by persons in especially historic times.... (Trans. Vol. I Pt. 2 at 116–17.)

ations have been released before and after 1980, in a continuing manner. (Trans. Vol. I Pt. 2 at 103, 116–118; Exh. P–28 at 8; Exh. P–44.)

It appears to the court that the area of contamination is not now nor in the future will continue to be neatly contained within water area eight which was identified in the Utah State Engineer's Interim Ground–Water Management Plan and adopted by the State and Kennecott as the Mining Impact Area. There is no physical barrier to prevent the contaminated waters from spreading or moving. Because of the dynamic nature of the plumes in question, it is likely that the area of contamination will shift, spread out and continue to grow larger.

### 2. Determination Regarding the Infeasibility of Restoration

The State and Kennecott presented evidence that it would be onerous and extremely costly to pump and treat the heavy metals within the low pH plume. (Trans. Vol. III Pt. 2 at 182.) Mr. Alkema testified on behalf of the State that pumping the ground water and cleaning it would be unworkable. (Trans. Vol. I Pt. 2 at 187–88.) He commented,

> [i]t would in my view not be feasible to do that [pump the water out of the ground to clean it]. The reasons are that it's an extremely large plume of contamination many miles in area; the volume is also very large. That the complexity of geology also makes it impossible to technically be able to remove the contamination because of variation and kinds of material, the rate with which the water can flow through the geology, the soil varies extremely from 50 to as high as 4,500 feet per year.

(Trans. Vol. II Pt. 1 at 2–3.) Mr. Alkema also testified that he believed that restoration could not succeed, and that likely any remediation of the contaminated waters "will cost in excess of several hundred million dollars." (Trans. Vol. I Pt. 2 at 185.)

SLCWCD presented expert testimony to the effect that reverse osmosis would be feasible to remediate a portion of the plume. (Trans. Vol. V Pt. 2 at 18.) Mr. William Surratt, an environmental engineer with Camp, Dresser & McKee, an international environmental firm, testified that "a reverse osmosis process can be used to treat the area of contamination which has been referred to as the sulfate plume." (*Id.* at 18–19.) With regard to treatment of the heavy metals or low pH plume Mr. Surratt testified that it was "much more difficult and much more expensive [than the sulfate plume]" but that "it can be done. *It depends on how much money you want to spend.*" (*Id.* at 21) (emphasis added.) Although Mr. Surratt had not conducted any testing and his analysis focused on feasibility, he testified that it would cost "at least 30 million" to build a reverse osmosis treatment plant that would treat the water from the sulfate and heavy metals plumes. (*Id.* at 21.)

Dr. Eric Tiepel, a chemical engineer with Resource Technologies Group, an engineering firm specializing in hazardous waste remediation, groundwater remediation, and mining related problems, testified on behalf of Kennecott that "all of these proposals [for remediation of the plumes] are feasible," and that "anything is feasible in terms of water treatment" but he noted "the results of this would be very impractical." (Trans. Vol. III Pt. 2 at 198.) Dr. Tiepel explained that "[w]e do not believe that it is feasible to treat directly the metals plume area without the consumptive use of practically all the water and the generation of very high quantities of sludges and brines as a consequence of that treatment." (*Id.* at 182.) He further testified that "[m]ost people who look at hazardous waste remediation systems typically do not use reverse osmosis as the primary treatment process, simply because it's very difficult to dispose of the brines because the brine volumes are generally very large as compared to the clean water that's produced." (*Id.* at 187.) With respect to the remediation scenarios proposed by SLCWCD, Mr. Tiepel testified that 35 to 75 percent of the water would be lost in the pretreatment process. (*Id.* at 191–92.)

Mr. Alkema testified at the hearing, consistent with his prior conclusion in connec-

tion with the proposed settlement, that remediation "[is] really not technically feasible to do in anybody's lifetime" (Trans. Vol. II Pt. 1 at 44) and that "we still don't believe there is, a way to actually clean up that aquifer." (Trans. Vol. I Pt. 2 at 164.) [10] He testified that the final EIA which Kennecott was to prepare was never finalized because

> [w]hat we would envision substituting for that, would be a remedial investigation feasibility study report that would have EPA's involvement and blessing and input. So that would be what I envision would take the place of the final Environmental Impact Assessment. We couldn't get to that ... without bringing in the Environmental Protection Agency into it. (*Id.* at 167.)

In this regard Mr. Alkema testified that even though the State would not require such remediation, the EPA might do so: "even if we assume worst case and collect the damage that we think is appropriate for the public loss that has occurred, and EPA finds in their look at this that the aquifer can be restored, the restoration would still have to take place under their authority, under a remedial action proposal." (*Id.* at 163–64.) In the meantime, Mr. Alkema identified source remediation as the State's number one and top priority. (*Id.* at 154.)

The State ultimately may be proven correct in having concluded that it would be infeasible to restore the contaminated waters. However, such finding may well be in error because the State failed to require completion of studies which were begun, and failed to identify and fully discuss possible alternatives for plume remediation and restoration.

### 3. Source Remediation

Eliminating the sources of contamination was identified by Mr. Alkema as the State's "number one priority." (Trans. Vol. I Pt. 2

at 154.) [11] It was brought out at the hearing that leach collection system upgrades, intercepting leachate by the installation of trenches, the lining and cementing of ditches, and piping some of the material are some of the efforts which have been instituted by Kennecott in order to reduce the amount of leachate contaminating the ground water. (*Id.* at 155.) Mr. Alkema testified, however, that this process is not complete and "*a lot more yet needs to be done* to eliminate the sources all the way around the south end of the waste dumps up Butterfield Canyon, all of the drainages need to be intercepted properly and ensured that the leachate is not getting into the groundwater." (*Id.* at 155–56) (emphasis added.) Mr. Alkema also testified about other actions taken by Kennecott to reduce sources of contamination in the area such as double lining of the small reservoir, removal of sludges from the large reservoir, reducing the volume of the large reservoir (to avoid overspill), construction of structures to intercept the good quality water and divert it away from the Bingham drainage, and installation of barrier wells above the large reservoir to intercept underground flow from Bingham Creek. (*Id.* at 157–60.) Mr. Alkema opined that these source remediation efforts are "*just the beginning of what needs to be done*" (*Id.* at 160) (emphasis added), and that although some of the source remediation efforts have been "initiated but are not complete, *others need to be taken.* ... " (Trans. Vol. II Pt. 1 at 8) (emphasis added.)

Mr. Adrian Brown testified that despite the remedial measures in effect now, contamination from Kennecott sources continues to occur. In this respect, the large Bingham reservoir and the leach collection systems leak, and approximately 50 percent of the waters from the Bingham Canyon underflow are not being recovered by the barrier wells. (Trans. Vol. III Pt. 2 at 82–83.) Mr. Bruce Kaliser testified on behalf

---

**10.** Mr. Alkema testified that "it was my conclusion that practically the only thing that will work and is feasible is to allow the aquifer to self-attenuate, to let it essentially be cleaned up by the soil as the contaminated water moves through it." (Trans. Vol. II Pt. 1 at 6.)

**11.** Mr. Alkema noted "even with the elimination of the sources of contamination, the plume is so extensive that there's a good chance that much of that water is, from the State's perspective, could not be used." (Trans. Vol. I Pt. 2 at 163.)

of the Intervenors that the following are currently contributing to contamination of the ground water: the large Bingham Reservoir, the small Bingham reservoir, the wash area along the Bingham Creek drainage, the Bingham Canyon underflow, the Northern east side dumps, the Southeast side dumps, the Yosemite dumps, the Lark dumps and the evaporation ponds. (Trans. Vol. IV Pt. 2 at 90–101.)

It appears to the court that while substantial source remediation has occurred, much more needs to be done. Yet, there is no specific requirement for such set forth in the proposed Consent Decree.

### 4. Need to Manage and Control Existing Contaminated Plumes

Mr. Alkema testified that "it is very difficult" to identify exactly where the plume is and where it's going. (Trans. Vol. I Pt. 2 at 144.) Mr. Alkema further testified that he understood at the time the Consent Decree was signed that "if nothing was done it [the area of contamination] was going to continue to grow" and that "even with just source elimination it was still going to grow almost as much as without source elimination." (Trans. Vol. II Pt. 2 at 83.) Mr. Alkema then opined that "the size of the plume will continue to grow for more than 100 years, much more than 100 years probably." (*Id.*)

No evidence was presented by the State or Kennecott at the hearing as to what should be done in order to prevent the plumes from contaminating waters outside the MIA. Nor was evidence presented by any party as to whether uncontaminated areas within the MIA can be protected from contamination. Also, no evidence was presented regarding what should be done to manage and contain the existing plumes, or the cost thereof.

Assuming that the contaminated plumes cannot be remediated, it appears to the court that the area of contamination will continue to grow and expand, and that active institutional management will be required to minimize and contain the prob-

lem. This is true now and will continue to be the case even if adequate source remediation occurs.

### 5. Measure of Damages

Mr. Alkema testified that the State evaluated the following methods of damage assessment: loss of value,[12] cost of treatment, and replacement. (Trans. Vol. II Pt. 1 at 33, 36, 39.) With regard to the loss of value method, Mr. Alkema characterized it as "a market value method" that "looks at the value of the resource strictly as a sale of water rights versus what that overall impact may be to the public." (*Id.* at 35.) As to the cost of treatment method, Mr. Alkema said that it involved the cost of "pumping water from the mining impact area and treating it and then using it as a drinking water supply." (*Id.* at 36.) Mr. Alkema testified about the drawbacks related to this method of treatment:

> "[i]t does not take into account that much of the water is already being used for purposes that don't require that level of treatment [drinking water]. It also really *did not take into account the feasibility* of this remedy. It was strictly a textbook kind of analysis where we looked at cost of treatment for a certain kind of water and just pulled that out and used it. *It was not a feasibility analysis in any way* as to whether this might or might not work and then it also deals with one of the tough issues as to what is the right, what is the damage because of the injury to the resource, to the public as a whole, and what is the damage to that resource that impacts the private water right holder." (*Id.* at 38) (emphasis added.)

Mr. Alkema testified that the cost of replacement method of damage involves "purchasing water rights for water of comparable quality that would have been there." (*Id.* at 39.) However, Mr. Alkema noted a fundamental difficulty associated with the replacement cost method:

> [i]t's really not true replacement in that if you take water from Bear River or

12. The "loss of value" method of damage assessment is also sometimes referred to as the "loss of use" method.

**566**

from out in Central Utah Project, you're really not replacing water, you're only moving that water from one place to the other and that was a concern we had that although it is acceptable as a replacement kind of alternative, it really does not replace water. (*Id.* at 40.)

He also noted that this type of damages analysis "assumes that there ... is a complete loss of the resource that has been damaged or injured, ... (and) it also provides ... a damage to the individual water right holder...." (*Id.*)

It was apparent at the hearing that the State utilized the loss of value method based upon market value in determining damages for purposes of settlement. In this regard, Mr. Alkema testified that in determining the settlement figure, "there were two factors, major factors that we considered, one was the amount of water in the terms of safe annual yield that was impacted and the other was the value of that water." (Trans. Vol. II Pt. 1 at 23.) Evidence was presented at the hearing as to the market value of an acre foot of water. (Trans. Vol. IV Pt. 1 at 32; Trans. Vol. II Pt. 1 at 29.) Kennecott and the State also presented evidence that the settlement agreed upon represents a fair market price for the safe annual yield of 13,000 acre feet of water within the MIA. (Trans. Vol. IV Pt. 1 at 32, 47.) In this regard, Dr. Charles J. Ciccetti, an economist employed by Arthur Anderson Economic Consulting and by the University of Southern California, testified on behalf of Kennecott that the price arrived at was "higher than it should have been." (*Id.* at 47.)

It is clear that the loss of value or loss of use method of evaluation was regarded by the State as strictly a market value method of computing damages. In this regard, neither Kennecott nor the State presented evidence of damages suffered by the State for loss of use other than estimated market value of the 13,000 acre feet. (*Id.* at 21–23.) No amounts were presented as to existence and option values or damages. Existence value is derived from the satisfaction of simply knowing that a natural resource exists, even if no use occurs. Option value is the value associated with an individual's desire to preserve the option to use the natural resource, even if it is not currently being used. In this regard, Dr. Ciccetti, Kennecott's expert, testified:

[W]e have a situation here where the injured resource is groundwater so the typical categories of damages that are related to recreation, to scenic and esthetic [sic] amenities, to the kinds of things that in most other natural resource damage claims cases are very important and involve a lot of time and effort. In this situation, *we just don't have those categories of damage,* so the lost services, that is, the lost utility to people that is relevant is the ability to use the groundwater for either municipal, commercial, or industrial or irrigation uses, in other words its value is limited to removing it from below the surface and bringing it up and putting it into some productive or consumptive use when it's needed and when it would be cost effective to do so.

(*Id.* at 21) (emphasis added.)

Evidence was presented indicating both a scarcity and an over abundance of water in the Salt Lake valley. (Trans. Vol. IV Pt. 1 at 29; Exh. D–2, p. 2; Exh. I–44, p. ES–2.) However, water scarcity in this arid part of the country was not adequately developed in terms of impact upon the existence value of the aquifer.

It appears to the court that the State prematurely utilized the "loss of value" measure of damages since it had not developed sufficient facts to justify its conclusion that the contaminated plumes could not be remediated. In any event, it appears that the loss of value method was not correctly applied. In this regard, the State purported to utilize the loss of value method in determining damages to its ground water resources, but it actually utilized a strictly market value approach, based upon water quantity measured by safe annual yield. Other use and non-use values apart from market value, including option and existence values, were regarded as inapplicable. Failure to take into account damages such as loss of the aquifer apart from market value of the quantity of water the State determined to be contaminated result-

ed in an inadequate assessment of damages under the loss of use method.

### 6. Nature and Extent of SLCWCD's Interest

Evidence was presented that at least one well is controlled by SLCWCD within the MIA. Mr. Bay, Chief Engineer of the Salt Lake Water Conservancy District, testified that "I found one [a water right belonging to SLCWCD] that lies within nearly the center of the plume area and several around the perimeter or within the areas that's defined here." (Trans. Vol. VI Pt. 1 at 9.) The District owns other wells in the area to which Mr. Bay testified:

One is located within 200 feet of the mining impact area, the other two are located within 1600 and 1700 feet, very close and those that I find would draw water from that area. The others are water right numbers 57–8817 located right here, (indicating), and right close to that is 57–2426. I determined that the state engineer would find that these are so close that they would draw water from area 8. (*Id.* at 11.)

The Sierra Club and the Mineral Policy Center were granted leave as Amicus Curiae to submit a memorandum of law following the evidentiary hearing, and the parties and intervenor were permitted to file post hearing briefs. On May 14, 1992, in an all day session, the court heard extensive argument on the ultimate issue, i.e., whether the court should approve the Consent De-

cree as being just, fair and reasonable and consistent with the purposes CERCLA is intended to serve, and the matter was taken under advisement. Now being fully advised, the court makes and enters its Memorandum Decision and Order.

## II. LEGAL ANALYSIS

### A. Standard of Review

■ The trial court's function when reviewing proposed consent decrees forged under CERCLA is to "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." *U.S. v. Cannons Engineering Corp.*, 899 F.2d 79, 85 (1st Cir. 1990). In this regard, the "statute's overreaching principles" are "accountability, the desirability of an unsullied environment and promptness of response activities." *Id.* at 91. Fairness in the CERCLA settlement context has both procedural and substantive components.[13] Clean up and remediation is the fundamental purpose of CERCLA.[14]

### B. Settlements in Which Federal Regulations are Not Followed

■ In this case the State chose not to follow the existing federal regulations in making its determinations.[15] It was not required to do so, but failure to do so eliminates the presumption of validity and correctness which otherwise the State

---

**13.** The First Circuit pointed out that procedural fairness evaluates the negotiating process and attempts to "gauge its candor, openness, and bargaining balance." *Cannons,* 899 F.2d at 86. In this case it appears that procedural fairness has been satisfied.

Substantive fairness requires that "a party bear the cost of the harm for which it is legally responsible." *Id.* at 87. It is "roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational estimates of how much harm each PRP has done." *Id.*

**14.** "Congress, in enacting CERCLA, intended to provide a vehicle for cleaning up and preserving the environment from the evils of improperly disposed of hazardous substances...." *Artesian Water Co. v. Gov't of New Castle County,* 659 F.Supp. 1269, 1286 (D.Del.1987) (quoting *Artesian I,* 605 F.Supp. [1348,] at 1357 n. 10.)

**15.** *See* 51 Fed.Reg. 27,674 (1986) (codified at 43 C.F.R. §§ 11.10–11.93 (1987)). Among other things the regulations require the Trustee to determine whether there has been an injury to the natural resources (43 C.F.R. § 11.61–.64), to quantify the amount of natural resources damaged (43 C.F.R. § 11.70—.73), and to assess the dollar amount of damages to be paid (43 C.F.R. § 11.80—.84). At the hearing Kenneth L. Alkema, the trustee appointed by the Governor of the State of Utah and Director of the State Division of Environmental Health, testified that "[w]e did not follow the procedural requirements that are spoken of in the regulation." (Trans. Vol. II Pt. 1 at 30, 31.) Mr. Alkema further testified that "he did not conduct a formal Department of Interior Part B assessment as outlined in the regulations." (*Id.* at 30–31.)

would enjoy.[16] This is important in a case such as this where the State has chosen to settle its damage claim *before* the remediation process. This "cart before the horse" approach is unusual as noted by the court in *In re Acushnet River and New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1019, 1035 (D.Mass. 1989):

> ... customarily, natural resource damages settlements follow or are contemporaneous with cleanup settlements. This is so because, customarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup, together with the lost use value and the costs of assessment. As a residue of the cleanup action, in effect, they are thus not generally settled prior to a cleanup settlement.[17]

## C. *Deficiencies in Proposed Settlement*

▋ The court has determined from a preponderance of the evidence at the hearing that the settlement contained within the proposed Consent decree is deficient in at least three major respects. *First,* lack of sufficient foundation for the State's determination that its ground water natural resource cannot be restored.[18] *Second,* failure to require substantial protection of State natural resources from further contamination. *Third,* failure to apply the proper measure of damages, which resulted in failure adequately to take into account the extent of the damages the State has suffered and will suffer as a result of the contamination. Failure to develop sufficient factual foundation to support the

State's determination that contaminated ground waters cannot be restored requires that the proposed Consent Decree be rejected for failure to demonstrate that the remedial purposes CERCLA was intended to achieve cannot be achieved. Failure to mandate containment and management of the contaminated waters, and failure to require further source control does not comport with the CERCLA requirement to *"protect* and restore." Inadequate consideration of damages requires that the proposed Consent Decree be rejected for failure to satisfy substantive fairness under CERCLA.

### 1. State's Determination Not to Require Restoration of its Contaminated Ground Waters

In this case the State determined that it is not feasible to restore the contaminated ground water within the so-called "Mining Impact Area." However, the State failed to require Kennecott to complete a final Environmental Impact Assessment which would have set forth and assessed possible remedial alternatives. When the 1990 Kennecott settlement offer was submitted, the State properly engaged experts to evaluate the offer. The State rejected the Kennecott plan for plume remediation, but remediation studies and evaluations called for by RCG/Hagler were not ordered to be completed. (Exh. P–44 at 5–1.) In Dr. Lall's review of the settlement offer he made it plain that analysis of the natural resources damage claim was "inextricably tied to the remediation issue," but he was not asked to complete his work. (Exh. P–47.) As a result, alternative possibilities for remediation which may have been suggested were

---

16. 42 U.S.C. § 9607(f)(2)(C) provides: "Any determination or assessment of damages to natural resources for the purposes of this chapter ... made by a Federal or State trustee in accordance with the regulation promulgated under section 9651 of this title shall have the force and effect of a rebuttable presumption on behalf of the trustee...." 43 C.F.R. 11.10 provides: "The assessment procedures set forth in this part are not mandatory. However, they must be used by Federal or State natural resource trustees in order to obtain the rebuttable presumption contained in section 107(f)(C)(2) of CERCLA."

17. In *Acushnet River,* the court ultimately approved settlement of the natural resource damages claim prior to and independent of the clean up and remediation process, but imposed conditions including a requirement to "protect and restore." *Acushnet,* 712 F.Supp. at 1038.

18. "Restoration" can be achieved by cleaning up and thus restoring a damaged resource, or by replacing or acquiring the equivalent of the damaged resource. See footnote 26, *infra.*

not identified. In this regard, at the hearing of this matter, SLCWCD presented a plan for partial remediation based upon reverse osmosis. Apparently that possibility, which was not fully developed at the hearing, was not analyzed by the State prior to its determination that remediation was not feasible. Also, it is not clear that the State's determination of the "safe annual yield" was fully analyzed.[19]

■ This court concludes that the State and Kennecott failed to demonstrate by a preponderance of evidence that restoration and plume remediation is not feasible in justification of the State's determination not to require such. Failure to develop sufficient factual foundation to support the State's determination that contaminated ground waters cannot be remediated requires that the proposed Consent Decree be rejected for failure to demonstrate that the remedial purposes CERCLA was intended to achieve cannot be achieved.

### 2. Failure to Require Source Control or Management and Containment of Existing Contaminated Waters

Section 9622(j)(2) of CERCLA requires a federal trustee, when settling a natural resource damage claim that contains a covenant not to sue for natural resource damages, to require the potentially responsible party (PRP) to commit to "actions necessary to protect and restore the natural resources damaged by such release or such threatened release." In this regard, 42 U.S.C. § 9622(j)(2) provides:

An agreement under this section may contain a covenant not to sue under section 9607(a)(4)(C) of this title for dam-

ages to natural resources under the trusteeship of the United States resulting from the release or threatened release of hazardous substances that is the subject of the agreement, but only if the Federal natural resource trustee has agreed in writing to such covenant. The Federal natural resource trustee may agree to such covenant *if the potentially responsible party agrees to undertake appropriate action necessary to protect and restore the natural resources damages by such release or threatened release of hazardous substances.* (emphasis added.)

In the *Acushnet River* case, the court ruled under CERCLA section 9622(j) that natural resources damages settlements which do not require clean up but which contain a covenant not to sue (on the part of the government)—must include provisions assuring that the responsible party will take actions necessary to "protect and restore" the injured natural resources. *Acushnet,* 712 F.Supp. at 1036.[20]

■ In this case, even though the State determined that it would be infeasible to "restore" the contaminated natural resource, it could have required a covenant to "protect" by way of source control as well as containment and management of the existing contaminated plumes.[21] However, the proposed Consent Decree contains no such protective requirements.

The proposed Consent Decree fails to require protection against further contamination by way of source control. Although the State does not waive its right to require source control, the Consent Decree fails to impose any substantial duties upon Kenne-

---

**19.** It is questionable whether 13,000 acre feet is an accurate estimate of the safe annual yield of contaminated waters within the MIA. Mr. Alkema testified at the hearing that, "[i]f your decision was not to enter this Consent Decree, we would definitely *complete* his (Dr. Lall's) report, *get more information,* and do whatever we needed to prove what safe annual yield was. In our mind it still is and will probably continue to be the 13,000 acre feet." (Trans. Vol. II Pt. 2 at 147) (emphasis added.)

**20.** The plain language of section 9622(j)(2) applies only to cases involving a federal trustee, with no corresponding provision applicable to

state trusteeships. However, consistent with the purposes of CERCLA, the "protect and restore" mandate should apply to covenants not to sue for natural resource damage settlements that precede clean up whether such involve federal or state trustees.

**21.** Such a covenant could have been required by the State as owner of the damaged ground waters. Utah Code Ann. § 73–1–1 provides "[a]ll waters in this state, whether above or under the ground are ... the property of the public, subject to all existing rights to the use thereof."

cott in that regard. It was demonstrated at the hearing that Kennecott has accomplished some source control,[22] but it was also made clear that much more is needed.[23] Notwithstanding such recognized need, the State has failed to require additional source control measures even though it is apparent that the contaminated plumes are being further contaminated by Kennecott operations.[24]

The proposed Consent Decree also does not address what will have to be done to manage and contain the existing contaminated waters, such as pumping water or other measures designed to "protect" uncontaminated waters from the damaged resource. In this regard, the proposed Consent Decree contains no provision requiring measures to be taken to minimize future expansion of the existing plumes, or to assure that the contamination will not spread beyond the MIA.[25]

■ The State and Kennecott did not present a sufficient factual predicate to convince the court that the proposed Consent Decree would be just and fair without a covenant to perform necessary additional source control and to provide for containment and management of the existing con-

tamination. Failure to require containment and management of the contaminated water, and failure to require further source control does not comport with the CERCLA requirement to *"protect* and restore."

### 3. The State Failed to Assess Damages Adequately

■ In the landmark case of *State of Ohio v. United States Dep't of Interior,* 880 F.2d 432, 444 (D.C.Cir.1989), at issue was the Department of Interior's regulations which provided that damages in such actions would equal the lesser of restoration or replacement costs, or diminution in use values. The court rejected the "lesser of" approach and held that CERCLA mandates a distinct preference for restoration costs as the measure of damages.[26] This court adopts and follows the *Ohio* court's rule of law in that respect.

The *Ohio* court also rejected a narrow interpretation of use values contained in DOI's rules which placed extraordinary reliance on market values.[27] The court ordered the DOI to issue a rule "that would permit trustees to derive use values for natural resources by summing up all reli-

---

**22.** Kennecott has engaged in a number of activities to alleviate sources of contamination including: lining the leach collection system, double lining and installation of a leak detection system in the small reservoir, reducing the level of water in the large Bingham reservoir and lining it, removing sludge from the large Bingham reservoir, and development of a surface water management system to redirect contaminated mine area surface waters to the concentrator. (Trans. Vol. I Pt. 2 at 155–61.)

**23.** See discussion on source remediation, pp. 564–65, *supra.*

**24.** Mr. Alkema testified at the hearing that "contamination continues" and that the "plume continues to grow." (Trans. Vol. II Pt. 2 at 126.)

**25.** The proposed Consent Decree does provide for a ground water permit program wherein a ground water discharge permit is required for active operations that have the potential to discharge to ground water. The permit is granted if an applicant can demonstrate that all discharges will meet applicable discharge standards. The program involves monitoring, sampling and reporting to ensure that the discharge standards are met. (Trans. Vol. II Pt. 1 at 10–

12.) This water permit program will help to prevent the contaminated plumes from growing larger, but does nothing to manage or contain the existing contamination.

**26.** The term restoration is commonly used by courts as "shorthand" for "restoring, replacing or acquiring the equivalent of the damaged resource." *See Ohio,* 880 F.2d at 441.

**27.** The *Ohio* court illustrated this point: "[I]magine a hazardous substance spill that kills a rookery of fur seals and destroys a habitat for seabirds at a sealife reserve. The lost use value of the seals and seabird habitat would be measured by the market value of the fur seals' pelts (which would be approximately $15 each) plus the selling price per acre of land comparable in value to that on which the spoiled bird habitat was located. Even if, as likely, the use value turns out to be far less than the cost of restoring the rookery and seabird habitat, it would nonetheless be the only measure of damages eligible for the presumption of recoverability under the Interior rule." *Ohio,* 880 F.2d at 442. The court then went on to say: "[f]rom the bald eagle to the blue whale and snail darter, natural resources have values that are not fully captured by the market system." *Id.* at 462–63.

ably calculated use values, however measured so long as the trustee does not double count." *Id.* at 464. In this regard, the court held that option and existence values "prima facie, ought to be included in a damage assessment," assuring full compensation for the lost resource. *Id.* While option and existence values may represent " 'passive' use, . . . they nonetheless reflect utility derived by humans from a resource, and thus, *prima facie*, ought to be included in damage assessment." *Id.*[28]

■ In this case, having determined that restoration is not feasible, the State turned to loss of value as the sole method of measuring damages. If further study demonstrates that restoration is feasible, the State would be obliged to follow and apply the statutory preference for restoration in assessing costs and damages, unless exceptional circumstances would warrant adoption of a different measure of damages. In this regard, the *Ohio* court did note that a possible exception to restoration could exist where "other considerations—i.e., infeasibility of restoration or grossly disproportionate cost to use value—warrant a different standard." *Id.* at 459. Assuming that this case presents the exception, and that the State would be justified in determining that restoration is not feasible, it appears that the State adopted a too narrow interpretation of use value by equating such with market value only. Manifestly, the settlement amount is based on loss of value which essentially calculates the alleged market value of the safe annual yield within the Mining Impact Area without reference to existence and option values. (Trans. Vol. II Pt. 1 at 23.) The State simply failed to assess the non-con-

sumptive use values of the aquifer, *i.e.*, option and existence values.[29]

It appears to the court that significant additional possible damages such as loss of the aquifer are not provided for in the proposed Consent Decree, even assuming that loss of value ultimately is determined to be the proper standard. Moreover, the State failed to calculate into the settlement the costs of preventing the plumes from spreading and contaminating the remaining unspoiled portion of the aquifer, by pumping water or other methods. In addition, the State did not require that the settlement include the cost of further source control which would at least lessen contamination from continuing on a daily basis. Apparently, the State clings to the possibility of future plume remediation to be ordered by EPA. That possibility is not a justifiable reason for the State to fail to adequately study possible alternatives or to fail to require a covenant to "protect and restore" State owned natural resources. In this regard, the settlement as proposed does not "capture fully all aspects of the loss." *Ohio*, 880 F.2d at 463.

This court concludes that inadequate consideration of damages requires that the proposed Consent Decree be rejected for failure to demonstrate to the court the existence of substantive fairness under CERCLA.

## III. INTERVENTION

■ Intervention in a CERCLA action is governed by CERCLA § 113(j) and is also subject to Fed.R.Civ.P. 24. A potential intervenor must (1) make a timely application for intervention, (2) have an interest in the subject of the action, (3) be so situated that without intervention the disposition of the

---

**28.** Very few resources, "such as plants and animals, possess an established economic value." Cross, Frank B., "Natural Resource Damage Valuation," 42 *Vand.L.Rev.* 269, 307 (1989). When a market does exist, the values ascribed may inadequately value the resource to the public. For instance, recreational sports anglers may find that the presence of fish has higher value or greater utility than commercial fishermen. *Id.*

**29.** Although the aquifer is unlike most other natural resources such as lakes, eagles or seals which have more obvious existence and option values, its existence value should have been considered in the settlement given the fact that people who live in a desert most likely would assign substantial value in just knowing that an aquifer exists. The Hagler Report (Exh. P–44, at p. ES–2) notes that there is "water scarcity in the valley." There was conflicting testimony at the hearing on this matter, but if true, this would certainly enhance existence value.

action may, as a practical matter, impair or impede the applicant's ability to protect his interest, and (4) have an interest not adequately protected by the existing parties. *United States v. Mid–State Disposal, Inc.,* 131 F.R.D. 573, 576 (W.D.Wis.1990). *See also United States v. Bliss,* 132 F.R.D. 58, 59 (E.D.Mo.1990). If one or more of the above criteria are not met, a party will not qualify for intervention of right, as distinguished from permissive intervention.

In this case, because of the exclusions contained in the Consent Decree preserving rights of third parties to recover for "interference with the quantity and quality of their water rights," adjudication of this action would not necessarily impair or impede the ability of non party third persons to protect their interests. The Consent Decree specifically provides that "the Decree does not resolve or bar claims, if any, of third parties, including, but not limited to, claims by political subdivisions of the State."

Turning to the petition of SLCWCD for intervention, the court has determined that permissive intervention should be granted. The petition of SLCWCD was timely under the circumstances of this case. Only after publication of the proposed Consent Decree did it become apparent that the State and Kennecott were *jointly* advocating settlement pursuant to terms thereof. Other factors to be considered in connection with permissive intervention are:

> the nature and extent of the intervenor's interest, whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties, whether the applicant will benefit by the intervention, whether the intervenor's interests are adequately represented by the other parties, and whether the intervenors will significantly contribute to the full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.

*Acushnet,* 712 F.Supp. at 1023. See Rule 24(b)(2) Fed.R.Civ.P. See also *United States Postal System v. Brennan,* 579 F.2d 188, 191–92 (2d Cir.1978).

After due consideration of the aforesaid factors, this court determines to exercise its discretion and to permit SLCWCD to intervene in this case. SLCWCD is uniquely situated to significantly contribute to the underlying factual and legal issues which have a bearing upon the just and equitable determination of legal questions presented.

Based upon the foregoing, this court concludes that the proposed Consent Decree as written is not just and fair or consistent with the purposes of CERCLA. Accordingly, the application for approval of the proposed Consent Decree is denied.

IT IS SO ORDERED.